## STANDARD SANITARY MANUFACTURING COMPANY *v.* UNITED STATES OF AMERICA.

APPEAL FROM THE DISTRICT COURT OF THE UNITED STATES FOR THE DISTRICT OF MARYLAND.

No. 554. Argued October 15, 16, 17, 1912.—Decided November 18, 1912.

A trade agreement under which manufacturers, who prior thereto were independent and competitive, combined and subjected themselves to certain rules and regulations among others limiting output and sales of their product and quantity, vendees and price, *held* in this case to be illegal under the Sherman Anti-trust Act of July 2, 1890. *Montague* v. *Lowry*, 193 U. S. 38.

A trade agreement involving the right of all parties thereto to use a certain patent, which transcends what is necessary to protect the

use of the patent or the monopoly thereof as conferred by law and controls the output and price of goods manufactured by all those using the patent, is illegal under the Anti-trust Act of 1890. *Bement* v. *National Harrow Co.*, 186 U. S. 70, and *Henry* v. *A. B. Dick Co.*, 224 U. S. 1, distinguished.

While rights conferred by patents are definite and extensive, they do not give a universal license against positive prohibitions any more than any other rights do.

The Sherman Anti-trust Act is a limitation of rights which may be pushed to evil consequences and should therefore be restrained.

The character of the Sherman Act is sufficiently comprehensive and thorough to prevent evasions of its policy by disguise or subterfuge.

The Sherman Act is its own measure of right and wrong; courts cannot declare an agreement which is against its policy legal because of the good intentions of the parties making it.

A party to an agreement in restraint of trade is none the less a party to the illegal combination created thereby because it is not subject to all the restrictions imposed upon all the other parties thereto.

A corporation having a manufactory in one State and warehouses in several other States held to be engaged in interstate commerce under the circumstances of this case.

*Quære*, whether one of the individual defendants in an equity case brought by the Government to dissolve an illegal combination under the Sherman Act, called as a witness by one of the other defendants in the same suit, obtains immunity from criminal prosecution as to the matters testified to.

There is no rule that civil suits brought under the Sherman Act to dissolve the combination must await the trial of criminal actions against the same defendants, and whether the trial of the civil action shall be delayed because some of the defendants refuse to testify as witnesses for other defendants is a matter in the discretion of the trial court, and in the absence of abuse, not reviewable.

191 Fed. Rep. 172, affirmed.

THE facts, which involve the legality under the Sherman Anti-trust Act of July 2, 1890, 26 Stat. 209, c. 647, of a combination of manufacturers, are stated in the opinion.

*Mr. Herbert Noble,* with whom *Mr. Henry D. Esta-brooke* and *Mr. Hartwell P. Heath,* were on the brief, for appellants other than Colwell Lead Company:

The gravamen of the Government's charge is that the scheme in this case amounted to a wicked conspiracy to circumvent the Sherman Act by basing it on a patented invention of slight or no importance which was used only as a subterfuge. Whether it is wicked to attempt to circumvent the Sherman Act depends somewhat upon the meaning of the Sherman Act as well as the meaning of the word "circumvent." Translated literally, according to its rhyme and not its reason, the Sherman Act is a blight upon enterprise. The venom of anarchy could not elaborate a more enervating, paralyzing proscription. All business would be under the ban of the law; with the result that it would be left to the caprice or favor of the Attorney-General to give immunity to favorites or punish enemies. If the Sherman Act means this, then we make bold to say that it is the righteous duty of every lawyer to circumvent the Sherman Act if it can be accomplished.

Where a man's remedy for a wrong is barred at law he does not circumvent the law if he resorts to equity. If what was done was legal, the question of motive is clearly immaterial. *Diamond Match Co.* v. *Roeber*, 106 N. Y. 473; *McCune* v. *Norwich Gas Co.*, 30 Connecticut, 521; *Glendon Iron Works* v. *Uhler*, 15 Am. Rep. 599; 20 Harvard Law Rev., Nos. 4, 5 and 6.

Irrespective of patent law or patent rights the acts of the defendants did not in any reasonable sense create a monopoly, restrain commerce, limit output, nor throttle competition, nor were they obnoxious to any fair reading of the Sherman Act. The rule of possible evil—that the mere power to do evil is equivalent to the actual doing of it would make potential bomb throwers of every one. In the very nature of things the law may not punish anyone for the wrong he might do if he were so disposed.

The court below erred in not decreeing that the agreements entered into by the defendants and upon which the petition is based were lawful under the patent laws of the

United States and not subject to the provisions of the Sherman Anti-trust Act.

Similar license agreements were sustained by the courts in *Rubber Tire Wheel Co.* v. *Milwaukee Rubber Works Co.*, 154 Fed. Rep. 358; *Indiana Mfg. Co.* v. *Case Threshing Mach. Co.*, 154 Fed. Rep. 365; *Goshen Rubber Works Co.* v. *Single Tube Tire Co.*, 166 Fed. Rep. 431; *Victor Talking Mach. Co.* v. *The Fair*, 123 Fed. Rep. 424; *Heaton Peninsular Co.* v. *Eureka Specialty Co.*, 77 Fed. Rep. 294.

The provisions in the license agreements as to prices were intended to enable the licensees to make a reasonable profit, so that they would be able to maintain and improve the quality of the ware, and pay the royalties reserved. The owner of a patent can protect his invention by making agreements controlling the product of the use of his invention, and which admit that by the use of that invention the product is better than if made by any other known method of manufacturing the product. *Henry* v. *A. B. Dick Co.*, 224 U. S. 1.

The constitutional idea of a time monopoly in a new creation is profoundly wise, as all experience has demonstrated. The right to withhold the use of an invention necessarily involves a right to attach to its use any condition however arbitrary, for the public is none the poorer if the invention is never used, whereas it may be benefited if the invention is brought into use on any terms; and in any event the monopoly lapses with the lapse of time, or is perhaps made valueless by a newer invention inspired by the one it supersedes. Cases *supra* and *Bloomer* v. *Mc-Quewan*, 14 How. 539, 548; *United States* v. *American Bell Tel. Co.*, 167 U. S. 224; *U. S. Consol. S. R. Co.* v. *Griffin & Skelley Co.*, 126 Fed. Rep. 364; *Rupp & Wittgenfeld Co.* v. *Elliott*, 131 Fed. Rep. 730; *New Jersey Patent Co.* v. *Schaeffer*, 159 Fed. Rep. 171; *New Jersey Patent Co.* v. *Schaeffer*, 178 Fed. Rep. 276; *Fonotipia, Ltd.*, v. *Bradley*, 171 Fed. Rep. 951; *National Phonograph Co.* v. *Schlegel*,

128 Fed. Rep. 733; *Edison Phonograph Co.* v. *Pike*, 116 Fed. Rep. 863; *Edison Phonograph Co.* v. *Kaufmann*, 105 Fed Rep. 960; *The Fair* v. *Dover Mfg. Co.*, 166 Fed. Rep. 117; *Commercial Acetylene Co.* v. *Autolux Co.*, 181 Fed. Rep. 387; *Æolian Co.* v. *Juelg Co.*, 155 Fed. Rep. 119; *Crown Cork Co.* v. *Brooklyn Bottle Stopper Co.*, 172 Fed. Rep. 225; *Crown Cork Co.* v. *Standard Brewery*, 174 Fed. Rep. 252; *Crown Cork Co.* v. *Standard Stopper Co.*, 136 Fed. Rep. 841; *Cortelyou* v. *Lowe*, 111 Fed. Rep. 1005; *Cortelyou* v. *Carter*, 118 Fed. Rep. 1022; *Cortelyou* v. *Johnson*, 138 Fed. Rep. 110; *S. C.*, 145 Fed. Rep. 933; *Brodrick Copygraph Co.* v. *Roper*, 124 Fed. Rep. 1019; *A. B. Dick Co.* v. *Milwaukee Co.*, 168 Fed. Rep. 930; *Indiana Mfg. Co.* v. *Nichols & Shepard Co.*, 190 Fed. Rep. 579; *Automatic Pencil Sharpener Co.* v. *Goldsmith Bros.*, 190 Fed. Rep. 205; *Thomas A. Edison, Inc.*, v. *Smith*, 188 Fed. Rep. 925; *Waltham Watch Co.* v. *Keene*, 191 Fed. Rep. 855; *Fuller* v. *Berger*, 120 Fed. Rep. 274; *Broderick Copygraph Co.* v. *Mayhew*, 131 Fed. Rep. 92; affd. 137 Fed. Rep. 596.

No attack is or could be made upon the validity of the patents, because the Arrott patent has been upheld by the courts. *Mott Iron Works* v. *Standard Sanitary Mfg. Co.*, 159 Fed. Rep. 135.

The inventions covered by the patents are automatic devices adapted to distribute enameling powder over the surface of the various articles of sanitary enameled iron ware while at a very high temperature.

Under the principle of the *Paper Bag Patent Case*, 105 U. S. 766, the owner of the letters patent here might have permitted the use of his invention for the purpose of manufacturing sanitary enameled iron ware upon condition that it should not be sold at all, and consequently that it might be sold upon prescribed conditions.

The court below erred in not decreeing that the agreements entered into by the defendants, and upon which the petition is based, were not in restraint of interstate

.trade and commerce and not in violation of the Sherman
Anti-trust Act, and that the use of the patents was not a
subterfuge.

The acts alleged in the petition so far as the evidence
in the case tends to establish them do not violate the
provisions of the Sherman Act. · The agreements in the
case at bar are not within the Sherman Act. *United States*
v. *Winslow*, 195 Fed. Rep. 578, 592. They were open upon
the same terms to all who chose to take advantage of
them. *United States* v. *Terminal Association*, 224 U. S.
383, 398, 410.

They were, moreover, based upon patents which created
a true monopoly, a grant from the sovereign—the Con-
stitution—so that to hold that this monopoly was viola-
tive of the Sherman Act would be judicial legislation and
an attack upon the whole patent system. *Henry* v. *A. B.
Dick Co.*, 224 U. S. 16, 27, 35.

The Sherman Act and the patent laws were passed under
separate grants of constitutional power and do not affect
each other. *Bement* v. *National Harrow Co.*, 186 U. S.
70, 91; *Rubber Tire Wheel Co.* v. *Milwaukee R. W. Co.*,
154 Fed. Rep. 358, 362.

The true construction of the Anti-trust Act, and one
not in conflict with any of the decisions, is that it does not
condemn a fair and reasonable attempt to avoid loss by
means of trade agreements which are intended to prevent
nothing but the cutting of rates below the reasonable
expense of production and reasonable profit thereon; nor
is . the monopolization referred to simply the complete
occupation of a certain field if that occupation may be
fairly accomplished. *Fonotipia, Ltd.*, v. *Bradley*, 171 Fed.
Rep. 951.

The legislative history of the act and its construction as
declared in *Standard Oil Co.* v. *United States*, 221 U. S. 1,
58, show that it has no application to economic agree-
ments to meet market demands. The agreements in the

case at bar are not within the Sherman Act, because their
dominant purpose was to promote the trade of the parties,
and there are in the agreements and in the acts under them
none of the elements pointed out in the *Standard Oil Case*
and the *Tobacco Case* as objectionable, such as enhancement
of prices; limitation of output; deterioration of quality;
or intimidation, coercion, or fraud.

On the contrary, in these agreements and acts under
them, prices were not enhanced, there was no limitation
of output, there was a great improvement in quality, and
there was no intimidation, coercion or fraud.

For other cases construing the act see *United States v.
Du Pont De Nemours* Co., 188 Fed. Rep. 127; *United
States v. John Reardon & Sons,* 191 Fed. Rep. 454; *United
States v. St. Louis Terminal Assn.,* 224 U. S. 383.

In the case at bar all manufacturers were offered, and
any could secure, a similar license agreement, and it was
to the pecuniary and selfish interest of the parties interested
to grant licenses to as many as possible. See *Mogul S. S.
Co. v. McGregor,* 23 Q. B. D. 598, A. C. [1892] 25.

For other cases holding trade agreements not to be
illegal under the Sherman Act, see *Hopkins* v. *United
States,* 171 U. S. 578, 592; *Anderson* v. *United States,* 171
U. S. 604; *Fonotipia, Ltd.,* v. *Bradley,* 171 Fed. Rep. 951,
959; *United States* v. *Knight Co.,* 156 U. S. 1; *Bigelow* v.
*Calumet & Hecla Co.,* 167 Fed. Rep. 721; *Camors-McCon-
nell Co.* v. *McConnell,* 140 Fed. Rep. 412, and 987; *Whit-
well* v. *Continental Tobacco Co.,* 125 Fed. Rep. 454; *Prame*
v. *Ferrell,* 166 Fed. Rep. 702; *Packet Co.* v. *Bay,* 200 U. S.
179; *Phillips* v. *Cement Works,* 125 Fed. Rep. 593; *S. C.,*
certiorari denied, 192 U. S. 606.

In this case, however, the Sherman law has no applica-
tion. *United States* v. *Winslow, supra; Fire E. C. Co.* v.
*Halsted,* 195 Fed. Rep. 295.

For the cases in which it has been held that a violation
of the Sherman Act is no defense in infringement suits,

see *Johns-Pratt Co.* v. *Sachs Co.*, 176 Fed. Rep. 738; *Otis Elevator Co.* v. *Geiger*, 107 Fed. Rep. 131; *National Folding Box Co.* v. *Robertson*, 99 Fed. Rep. 985; *Bonsack Machine Co.* v. *Smith*, 70 Fed. Rep. 383; *Strait* v. *National Harrow Co.*, 51 Fed. Rep. 819; *Brown Saddle Co.* v. *Troxel*, 90 Fed. Rep. 620; *Soda Fountain Co.* v. *Green*, 69 Fed. Rep. 333; *Edison El. Light Co.* v. *Sawyer-Man Co.*, 53 Fed. Rep. 592; *Columbia Wire Co.* v. *Freeman Wire Co.*, 71 Fed. Rep. 306.

The claims made by the Government have not been sustained and the authorities relied upon by it can be distinguished. The license agreements are entirely beneficial and have harmed no one.

The court below erred in not granting the motion of the defendants for an enlargement of time to take testimony and that the hearing of the case be postponed until the testimony of the defendants could be completed.

A motion was made at the hearing below for the enlargement of the time of the defendants to complete their testimony on the ground that they had been prevented, by the petitioner's action in instituting criminal proceedings, from properly presenting their defense.

In view of the warnings against the individual defendants testifying as witnesses, and of the necessity of standing trial upon these indictments the individual defendants were unwilling to voluntarily appear and testify, lest by so doing they should furnish the Government with some information which might be used against them upon the said trial.

No matter how innocent a man may believe himself to be, or may be advised as a matter of law that he is, it is perfectly proper for a man to refuse to put himself in a position where what he says may tend to incriminate him if by a reasonable delay, to be granted by a court of equity, he can equally well protect himself and his property at a somewhat later date without any harm to the public.

*Mr. Robert B. Honeyman*, with whom *Mr. A. Parker Smith* was on the brief, for the Colwell Lead Company, appellant.

*Mr. Edwin P. Grosvenor*, Special Assistant to the Attorney General, with whom *The Attorney General* was on the brief, for the United States:

This case presents the latest contrivance for evading the rules prescribed by the Sherman Act in the conduct of interstate commerce, and particularly "the rule of free competition among those engaged in such commerce." Mr. Justice Harlan in the *Northern Securities Case*, 193 U. S. 331. Since that act was passed in 1890 this court has had occasion to consider various forms of combinations and monopolization. The earliest form was that of an unincorporated association with a constitution and by-laws accomplishing unlawful restraints condemned in the *Addyston Pipe Case*, 175 U. S. 211; *Montague* v. *Lowry*, 193 U. S. 38; *Trans-Missouri Association Case*, 166 U. S. 290, and *Joint Traffic Association Case*, 171 U. S. 505. Destruction of competition between manufacturers through the adoption of a common selling agency given the form of a state corporation was held unlawful in the *Continental Wall Paper Case*, 212 U. S. 227. The holding company as a means of suppressing competition whether between railroads or between industrial companies received the same judgment in the *Northern Securities Case, supra,* and in the *Standard Oil Case*, 221 U. S. 1. In *Miles Medical Co.* v. *Park & Sons*, 220 U. S. 373, this court pronounced unlawful a scheme of so-called agency contracts under which a manufacturer attempted to establish uniform prices on all sales by wholesalers and retailers of proprietary medicines manufactured by him. In the case against the Tobacco Trust, it was held, 221 U. S. 106, that the American Tobacco Company and five other companies organized

under the laws of New Jersey were unlawful combinations, among other reasons because they had acquired monopolistic power with a wrongful purpose and by methods inconsistent with a natural and normal expansion of business. In *United States* v. *St. Louis Terminal Association*, 224 U. S. 383, it was decided that a terminal association of railroads is an illegal restraint so long as it does not act as the impartial agent of every line which, owing to geographic conditions, is under compulsion to use its instrumentalities.

The case at bar is an instance of an attempt to conceal an agreement fixing prices and interfering with competitors under the guise of a legitimate licensing arrangement for the use of patents. The appellants incorporated the unlawful restraints in so-called "license agreements," each corporation defendant entering into one of these "license agreements" with the same contracting party, to whom three patents had been transferred before the signing of the contracts.

In every case we must use the standard of reason for the purpose of determining whether or not an act or alleged restraint of commerce has brought about the harm from which the Sherman Anti-trust Act is intended to guard the people. *Standard Oil Case, supra.*

If the acts complained of have caused the wrongs which the statute forbade, resort to reason is not permissible to allow that to be done which the statute prohibits. It matters not what form the combination may take, or what garb or dress it may put on, for if it directly restrain commerce it falls within the operation of the statute. *Standard Oil Case*, p. 106; *Northern Securities Case*, 193 U. S. 197, 347.

The appellants adopted in this case a form of combination different from any heretofore considered by this court. But it is the form alone that is new. Behind the grinning mask of the "license agreement" is the common,

vulgar type of monopoly which many times has been condemned by this court, dangerous alike to "individual liberty and the public well-being." *American Tobacco Co. Case,* 221 U. S. 183.

*Continental Wall Paper Co.* v. *Voight,* 212 U. S. 227, and *Miles Medical Co.* v. *Park,* 220 U. S. 373, dispose of this case.

In the first case the element of combination is present which is absent in the second. In each case the contracts were devised with the object of controlling the resale prices of jobbers and of eliminating all competition between jobbers as to prices. The two cases supplement each other, one holding that manufacturers cannot combine through a selling agency and the other that a manufacturer cannot dictate the prices on all sales of his products by all dealers at wholesale and retail.

All combinations obstructing the free flow of interstate commerce or interfering with the citizen's right to engage in commerce or suppressing competition in commerce are unlawful. These propositions are past dispute.

The restraints complained of by the Government substantially and directly operate upon commerce in unpatented enameled ware and only indirectly relate to the use of the patented article or dredger.

It was competition in commerce in unpatented bathtubs which appellants destroyed, and upon persons engaged in commerce in that ware they imposed their unreasonable restraints.

While it is true that the property right to a patented machine may pass to a purchaser with no right of use, or with only the right to use in a specified way or at a specified place or for a specified purpose, nevertheless restraints so imposed must be legal and reasonable conditions attached to the use of the patented article. They cannot be restrictions inherently violative of some substantive law. *Henry* v. *Dick Co.,* 224 U. S. 1, 24, 26.

In the case at bar the restrictions were not reasonable and legal conditions attached to the use of the patented machine, for they restrained trade and promoted monopolization of commerce in articles not patented. Moreover, the restrictions were not attached to the use of the patented tool, but applied to acts subsequent to the use; that is, to what was done after the use of the tool embodying the invention. The restraints were laid upon the distribution of and commerce in ware in the making of which the tool was used.

In the *Dick Case, supra,* the restriction provided that in the use of the mimeograph the only paper used should be paper which had been supplied by the patentee. Therefore the condition became effective at the time of use of the patented article. There was no attempt to control the output of the mimeograph, or to fix the price at which the users of the mimeograph should sell the mimeographed copies.

Breach of the conditions in the Wayman licenses could occur only after the use of the patented Arrott dredger, for those conditions applied solely to acts performed after the use. Acts in interstate commerce subsequent to the use are not related to the use, and accordingly conditions attached to those subsequent acts do not qualify the use. Therefore it is clear that sales to non-licensed jobbers or sales at prices different from the established prices do not in any sense constitute a use of the invention in a "prohibited way," but are, in fact, violations of those terms of the contracts which apply to the disposition of non-patented articles.

It is immaterial whether or not the patented tool is essential in producing the enamel ware, for in any event no restriction laid upon the distribution of the ware in commerce can relate back so as to qualify even remotely the use of that tool during the manufacture of the ware.

The license agreement sustained by the Dick decision created no monopoly in unpatented things, for it left the whole world free to manufacture and sell paper and ink. It reserved to the patentee the sole right to supply specified unpatented articles to specified persons, but it did not prevent any other persons manufacturing and distributing those unpatented articles generally to all except to those who had bought the patented mimeograph. It gave to no one control either over the source of supply of the unpatented articles or over the demand for those articles, except in respect to the person who bought the patented mimeograph. As to him only was the market curtailed and the demand controlled.

On the other hand, in the case at bar the direct object of the appellants was to monopolize commerce in articles unpatented and of universal use. The combination directly affected and absolutely controlled every phase of that commerce. It not only dictated the prices on sales from the manufacturers to the jobbers and every term and condition applicable to those sales, but also regulated in the same detail the sales of the jobbers to the plumbers. Moreover, every restriction contained in the agreements has been cruelly and oppressively enforced and maintained.

The patentee who grants a license to make and use the patented machine has no control by virtue of his patent over the article made with the help of the patented machine. *Keplinger* v. *DeYoung*, 10 Wheat. 358; *Merrill* v. *Yeomans*, 94 U. S. 568.

No word or phrase in the Sherman Act reveals an intent to exempt the owners of patents from its sweeping provisions against monopolistic combinations. *United Shoe Machinery Company* v. *La Chappelle*, 99 N. E. Rep. 289.

The patent laws and the Sherman Law are not conflicting, but in their respective domains are mutually exclusive of each other.

The right conferred by the patent laws is not the right to make, use and vend the thing patented, for this right exists by virtue of the common law and independently of the patent statutes; this right to make, use and sell the patented devise is a natural right. The only right which the letters patent grant is the right to exclude all other persons from making, using or vending the thing patented without the permission of the patentee. *Bloomer* v. *McQuewan*, 14 How. 539, 548; *Patterson* v. *Kentucky*, 97 U. S. 501, 506.

The right to sell a patented article is subject to the police regulation of the State. *Patterson* v. *Kentucky*, 97 U. S. 501, 505; *Webber* v. *Virginia*, 103 U. S. 344, 347; *In re Brosnahan*, 18 Fed. Rep. 62, 165.

In the cases last cited the exercise of the police power of a State in prohibiting the sale of patented articles was held not to be in conflict with the patent laws of Congress. If the State may prohibit altogether the sale of patented articles because of injury resulting from such sale to its citizens, it follows that the State may prohibit the sale of patented articles pursuant to combinations in restraint of intrastate trade and commerce, for such combinations are equally harmful to the public. In the one case the State is prohibiting any sale, in the other case it is merely regulating the sale of the patented article in so far as it declares that no such sale shall be made under any unlawful combination monopolizing or restraining intrastate commerce. In either case the State is exercising its police power to protect its citizens; neither exercise of power conflicts with the patent laws. The reason is clear. The regulation of the State is being applied to natural rights and not to patent rights. The right to sell, a common-law right, is denied by the State in the one case and regulated in the other, the State acting in each case for the good of the public.

In passing the so-called anti-trust statutes Congress and a state legislative body act under different sources

of power, but in each case the exercise of the power arrives at the same result, namely, prohibition of restraints of trade and of monopolies. The effect of the state act and of the Sherman Act is the same; that is, the two acts relate to and operate upon the same subject-matter, although one is enacted under the police power of the State and the other under the authority of Congress to regulate interstate commerce. If the exercise of the police power of the State does not encroach upon the domain of the patent laws, it cannot in reason be argued that to include within the operation of the Sherman Act combinations restraining trade is to subtract from the monopoly of the patentee.

Whether appellants were entitled to further time for the taking of testimony was a matter resting in the discretion of the lower court. The Sherman Act provides four remedies: a criminal proceeding, a suit in equity, forfeiture of property and an action in treble damages.

The wisdom of the law and the effect of rigid enforcement are not matters for consideration by the court, but by other departments of the Government. *Armour Packing Co.* v. *United States*, 209 U. S. 56, 82.

MR. JUSTICE McKENNA delivered the opinion of the court.

Suit by the Government against appellants for a violation by them of the act of July 2, 1890, 26 Stat. 209, c. 647, commonly known as the Sherman Anti-trust Act.

A decree was entered in favor of the Government, from which appellants (designated herein as defendants) have prosecuted this appeal. 191 Fed. Rep. 172.

There are sixteen corporate and thirty-four individual defendants, the latter, with the exception of Edwin L. Wayman, being the officers, presidents or secretaries, of the companies.

The corporate defendants were alleged to be the manufacturers of enameled iron ware in various places in the United States, manufacturing 85% of such ware and engaged in interstate commerce in such ware throughout the United States and with foreign countries in competition with one another and with certain other manufacturers of such ware, and that in 1909, or early in 1910, they entered into and engaged in a combination and conspiracy to restrain such trade and commerce.

The defendants denied the charges against them, Wayman doing so in a separate answer. The Colwell Lead Company denied that it was engaged in interstate commerce.

A great deal of testimony was taken and the case quite elaborately argued, but in the view we take of it it is in comparatively narrow compass, depending upon the application of well-settled principles.

The corporate defendants are manufacturers of sanitary enameled iron ware, such as bath tubs, wash bowls, drinking fountains, sinks, closets, etc. The enameling consists in applying opaque white glass to iron utensils, first in the condition of a liquid and, second, in the form of a powder. The process consists in heating the utensil to a red heat and then sifting upon it the enameling powder. The powder is fused by the high temperature and forms on the utensil a hard, impenetrable, insoluble, smooth and glossy surface.

Prior to the invention of James W. Arrott, Jr., covered by letters-patent issued September 26, 1899, the enameling powder was applied by a sieve attached to a long handle which was held by the workman with one hand and the sieve made to vibrate by the workman striking the handle with his other hand, thereby sifting the powder over the surface of the iron ware. The implement was an imperfect one, not easily handled, and by its use the workmen were subjected to intense heat and physical strain. The

flow of the powder beside was not continuous; it was cast upon the metal in intermittent puffs, causing in many instances an unequal distribution of the powder and producing defective articles which either had to be thrown away or sold as "seconds." With Arrott's invention these evil results are lessened or disappear. The sieve is mechanically vibrated very rapidly, causing, instead of an intermittent flow of the powder as in the hand process, a practically continuous flow. Both hands of the workman may be used to guide and direct the sieve. The advantages of the instrument over the hand process are decided. It is more efficient and more economical. It makes a better article and in less time. There is no waste in defects or "seconds." The workman is relieved to some extent from "fierce heat conditions," to quote from the answers.

At the time of the contracts which are attacked by the Government the Standard Sanitary Manufacturing Company was the owner of the patent and manufacturer of 50% of the ware, and used in its production the patented device. Some of the other manufacturers were infringing and controversies existed. Some yielded to its validity, others contested it. It was sustained by the courts in several cases.

We have gone through this detail to exhibit the conditions, as asserted by defendants, which confronted them and induced their contracts. In further display of it we quote Wayman's answer as follows:

"For the reasons stated, the art was in a very unsatisfactory condition. No means had been discovered of accomplishing the result produced by the use of the Arrott invention without laying the user of such means open to a suit for infringement by the owner of the Arrott patent. The manufacturers using the process in use prior to Arrott's invention were unable to successfully compete with those using the Arrott invention, and moreover, produced a

disproportionate number of defective, unsightly and substantially unsaleable articles. The consumer was deceived and defrauded and the use of Sanitary Enameled Iron-Ware lessened and its reputation depreciated by defective articles being palmed off on the consumer as not defective."

On the situation thus asserted to exist the defendants build their defense, contending that Wayman saw its evils and conceived the way to correct them; and insist that the following facts are established by the evidence: Wayman was familiar, through his connection with another enameling company called the Seamless Steel Bath Tub Company, with the enamel ware trade and had become convinced of the advantages, indeed, necessity, of the use of the Arrott invention. He tried to secure it, but the Standard Company seemed unwilling at that time to confer its utility upon other companies, and pending the negotiations the Seamless Company failed and Wayman turned to other plans, one of which resulted in the contracts under review.

As early as 1908, impressed with the importance of the Arrott patent, he endeavored to have the Standard Company grant licenses to other companies in order to improve trade conditions, and to this end he tried to interest other gentlemen in the project. The Standard Company was unwilling to grant, and other manufacturers were equally disinclined to accept them. He then conceived the idea of a holding company, but this failed also, the Standard still being unyielding, stating by one of its officers that "his company was unwilling either to sell the Arrott patent or to enter into any arrangement which would lessen the advantage which it had by reason of the ownership of the Arrott patent." The plan was, therefore, abandoned.

In August, 1909 (we are still following the version of the testimony given by counsel for defendants), it was suggested to Wayman by a person connected with one

of the manufacturing companies that he (Wayman) apply
for the position of secretary of the Association of Sanitary
Enameled Ware Manufacturers which was about to be
reorganized. The position, it was said, would give Way-
man an excellent opportunity to continue his efforts to
buy the Arrott patent and establish such relation with the
manufacturers of enameled ware as would enable him to
present in the most favorable manner his ideas in regard
to the advantages of patent licenses under the Arrott
patent. This association was a pure trade organization
and not formed to control or regulate prices. Wayman
applied for and obtained the position and commenced
again negotiations for the Arrott patent and persisted,
against the apparent reluctance of the Standard Com-
pany to give up the advantages of the patent. Finally
he impressed the manager of the Standard factories with
the greater advantages which would come to his company
by the elimination of "seconds" and removing them as
competitors of the better articles of the Standard, confining
the competition to such articles of which the Standard pro-
duced 50%. The manager of the Standard and that com-
pany yielded to the representation of these advantages.

These advantages are dwelt on and made much of by
counsel and they quote testimony to display their extent.
"Seconds," as we have said, were articles of inferior or
defective manufacture, and as their inferiority was not
apparent they could be represented and sold as of stand-
ard quality. Such deception, it is asserted, was frequently
practiced, and the articles turning out defective discredited
enamel ware, gave it a bad reputation, and there was a
growing difficulty to maintain or extend its sale. With
"seconds" out of the way, it may be conceded, as it is
contended, that only honest articles were available to
plumbers, jobbers and builders.

The Standard Company fixed a price upon the Arrott
patent and gave Wayman an option upon it. He, in the

following December, secured also an option from the J. L. Mott Iron Works upon a patent called the Dithridge, and from the L. Wolff Manufacturing Company an option upon the Lindsay patent. These patents were infringements of the Arrott device. Thus equipped, Wayman proceeded to engage the manufacturers in his proposition.

This summary of the situation counsel have supplemented by a declaration of motives. Counsel say that Wayman and the manufacturers were advised by able and competent lawyers of the legality of their plan. "Wayman's motive," it is asserted, "was to make money for himself, not as a manufacturer but as the owner of a patent, receiving royalties from those whom he licensed to use his patented invention." The form of his license, it is further asserted, followed the precedents and was based on that principle of the patent law which gives to the owner of an invention the power to grant to others its use or to withhold it, or to grant it upon such terms as he may choose to impose. Such being his motive and such being his right, he, it is contended, negotiated with and contracted with the manufacturers of enameled ware. And their motives also are attempted to be justified, though the necessity for doing so is disclaimed.

Wayman's right, it seems to be contended, is all sufficient, and that the manufacturers only paid the price that he could legally demand. As the demand was legal, it is argued, the payment of the price could not be illegal. But the Government asserts subterfuge, illegal purpose liveried in legal forms to give color of right to illegal practices.

The charge challenges consideration of the relation between that which the manufacturers engaged to do and the protection of the exclusive right attached to the invention. Upon such consideration how far the licenses transcend such right and violate the Sherman Law we can then determine. And we shall keep in mind and apply

the principle expressed in *Bement* v. *National Harrow Company*, 186 U. S. 70, 92, that the Sherman Law "clearly does not refer to that kind of a restraint of interstate commerce which may arise from reasonable and legal conditions imposed upon the assignee or licensee of a patent by the owner thereof, restricting the terms upon which the article may be used and the price to be demanded therefor. Such a construction of the act we have no doubt was never contemplated by its framers."

In our inquiry we shall accept *arguendo* the statement of defendants of their inducement and purpose. We say "*arguendo*" because the asserted inducement and purpose are denied by the Government, it contending, as we have seen, that the Arrott patent was but a pretense and that the agreements were put in the form of licenses of it to at once accomplish and palliate evasions of the law. The fact being in controversy, we place our consideration and decision on other elements. In other words, we will consider the case from the standpoint of defendants' view of the situation, with comments as we proceed as to what they did to meet it and how far what they did accorded with or transgressed the law.

The contention of the defendants then is that the Standard Company's position and power as owner of the patent, and Wayman's were identical. What it could have done, it is contended, he could do, and its relation to the trade and the relation of other manufacturers to the trade clearly demonstrate, it is further contended, that as that company could have made the contracts, Wayman could do so.

To support the contention defendants represent the Standard as the dominant (it produced 50% of the articles) and the only honest manufacturer pointing out to other manufacturers the worthlessness of their output, they not having the Arrott patent; also the dishonesty of their output, they putting out "seconds," the inferiority

of which was "discernable only by experts"—thereby defrauding the public, "discrediting the ware and demoralizing the market and business." To avert these evil results, it is represented that the Standard was willing to forego the advantages which its ownership of the Arrott patent gave it and confer them upon the other manufacturers. But upon terms. "First and foremost" it was to be agreed that no "seconds" should be marketed. In the second place, a standard price must be agreed to so that henceforth rivalry should be "in the quality of the ware turned out at a uniform price or in any other collateral inducement to the purchaser" that would not "affect the quality of the ware." Wayman's agency and office, it is represented, was that of "watching all parties and insuring their fidelity to the agreement by the payment of a royalty for the use of the invention." And this, it is said, is "all there is in substance or principle to the case at bar, except that Mr. Wayman, instead of the Standard Company, was the originator of the scheme and that he persuaded his co-defendants to enter into it."

But the scheme has other features and effects which counsel overlook or ignore. It is immediately open to the criticism that its parts have no natural or necessary relation. What relation has the fixing of a price of the ware to the production of "seconds"? If the articles were made perfect their price in compensation of them and by unfettered competition would adjust itself. To say otherwise would be in defiance of the examples of the trading and industrial world. Nor was a combination of manufacturers necessary to the perfection of manufacture and to rivalry in its quality. And it may be asked if such perfection and its protecting influence against deception and the ruinous depression of prices were so desirable and potent as it is contended that they were, why were they not extended to "baths," the most important of the articles in the trade? It is not an adequate answer to say that

there was a time guarantee of them even though it was given to all of them, as it was not. The justification of defendants is based not on the responsibility of manufacturers but on the integrity of the articles assured by the use of the Arrott device.

It is the foundation of defendants' argument that to make the use of that device universal was the prompting of Wayman's energies to unite the manufacturers and to remove the evils which beset the trade and which were "discrediting the ware and demoralizing the market and business." It was the representation of the advantage, we are told, of such results that broke down the resolution of the Standard Company not to share the use of the device with other manufacturers. But granting that there was provision or security against the production of "seconds" in all of the articles, it seems from what we have said above that all of the substantial good which is asserted to have been the object of the agreements could have been attained by a simple sale of the right to use the Arrott patent, conceding to it the dominant effect which is attributed to it. Nor is the justification of defendants made more adequate by the representation that "Wayman's motive was to make money for himself, not as a manufacturer but as the owner of the patent, receiving royalties from those whom he licensed to use his patented invention." Wayman testified to another motive. By fixing prices "he hoped," he said, "as one of the features of the license agreements, to enable the companies to abolish ruinous competition" and to get a "revenue for each of the companies to enable them to make a reasonable profit."

But motives and inducements may not be easily estimated, and we will pass to a consideration of the agreements. On March 30, 1910, the Manufacturers' Association passed a resolution and a committee of five was constituted, to be known as the price and schedule com-

mittee, to which the license agreements and resale agreements should be referred. This committee was to interview the various manufacturers and obtain their consent to the agreements which were to become effective "when the consent of 83% of the production" was had. The signatory manufacturers agreed to "give their prompt coöperation to the matter in question."

At the same time the following resolution was passed:

"Whereas, a proposition is pending for a license agreement and a resale price for the benefit of the jobbing trade, and

"Whereas, long-term contracts are a menace to said proposition,

"We, the undersigned, manufacturers of enameled ware, hereby agree to take no orders for delivery beyond May 31, 1910.

"This agreement is not binding upon the signers unless all members of the Enameled Ware Manufacturers' Association are parties thereto and append their signatures.

"The within is agreed to."

At the same meeting a memorandum of agreement was proposed which was to be executed with Wayman as licensor of various patents covering pneumatic dredgers. The agreement covered selling schedules of the ware and provided for the royalties to be paid; the selling price to the jobbers to be established by the licensor through a committee appointed by the various manufacturers. It provided penalties for the violation of the price regulations, and preferential discounts (discounts allowed to certain manufacturers) from the selling prices. Such discounts were to be allowed on sales to jobbers only.

Such details as might "be necessary for the perfection of the arrangement" were reserved for the next meeting of manufacturers. After this meeting a circular letter was sent by Wayman to all manufacturers apprising them of what had transpired, the attention that had been

given the subject and informing them that "the final license agreement papers" would be executed at the next meeting, to be held in May.

The license agreement was subsequently executed. It granted to the licensee the right to use in the manufacture of enameled ware the Arrott patent, also a patent to E. Dithridge for a pneumatic sieve and a patent to William Lindsay for an "Enameling powder distributor." It released the claims for past infringement so long as the licensees operated under the license. It fixed royalties of $5.00 per day for each furnace, subject to a diminution of like amount for furnaces shut down for more than six consecutive working days. It fixed preferential discounts from the regular selling prices, confining them only to sales by the manufacturers to jobbers. And it was provided that no goods manufactured under the license should be sold unless they bore a registered label (except where otherwise specified) owned by the licensee and in addition thereto a license tag or label approved by the licensor placed in a visible position thereon.

The provision for prices was as follows:

"The Licensor agrees that he will employ a commission of six (6) persons, of which he is to be one and to act as chairman thereof, five of whom shall be designated by a majority of the parties holding licenses similar to this license, which commissions shall have supervision of all the relations and transactions between the parties hereto under this agreement, but it is understood that where a member of said commission, or his company, shall be directly interested in any question of a violation of the license to be decided by the said commission, said member shall be disqualified and a temporary member shall be appointed in his place by the remaining members of the commission.

"All terms and conditions relative to prices and discounts now established by the Licensor and set forth in

the annexed schedules and made a part hereof, shall remain in force and effect until other terms, conditions and preferential discounts are substituted therefor by the Licensor, which substitution can only be made by him with the approval of a majority of the members of the commission, hereinbefore prescribed. Notice of such changes and substitutions shall be given from time to time in writing by the Licensor to the Licensees. The Licensee covenants to adhere to and maintain such terms, conditions, regulations, prices and preferential discounts as may be established by the Licensor, from time to time, *and the Licensee further agrees to sell no 'seconds' or 'Bs' covered by Schedules 4, 4½, 5 and 6.*" (Italics ours.)

The restrictions as to prices at which the goods were to be sold did not apply to those sold and exported to foreign countries. Such sales were required, however, to be proved to the licensor.

There was a provision for the return of 80% of the royalties paid if the agreement should be complied with. These royalties, called in the agreement "Royalty Rebates," were forfeited if the provisions of the agreement should be violated in any particular.

The foregoing constitute the essential provisions of the manufacturers' agreements and it will be observed what little space is given to "seconds," though it is asserted in the argument, as we have seen, that to get rid of the evils of their production and sale was the chief impulse to the agreements. The covenant as to "seconds" was expressed by the words which we have italicized in the provision relating to prices and discounts quoted above. The schedules referred to are found in the paragraph providing for preferential discounts and cover all articles but baths, these being described in schedules 1, 2 and 3.

There was also a jobber's license agreement that bore at the top the note that it "must be executed by the purchaser in order to purchase licensed sanitary enameled

46 OCTOBER TERM, 1912.

Opinion of the Court. 226 U. S.

ware." It conveyed to the jobber the right to buy and sell
such ware, provided for certain discounts and details
as to shipments and deliveries, and that the sales were to
be made "by the purchasers at prices to be established
and prevailing in the various zones into which the goods
were shipped, regardless of the point of purchase." There
was a provision for the payment of the purchase price
at certain rebate periods if the agreement should be com-
plied with. The resale prices as established from time
to time were required to be maintained by all jobbers
and dealers, and sales could not be made from one jobber
to another for any better prices than "established by the
sheets," and the purchaser agreed to "observe and strictly
maintain . . . the selling prices as they are set
forth in the schedules and observe and adhere to the rules
and regulations as embodied in the price sheets" or em-
bodied in price sheets which might be issued by or under
the authority of the licensor. Articles might be added
to or removed from the schedules at any time. The
purchaser also agreed during the life of the contract not
to purchase, sell, advertise or solicit orders for, or in any
way handle or deal in, sanitary enameled iron ware of
any manufacturer not licensed under the letters-patent
enumerated in the agreement, except with the express
written permission of the licensor. A breach of any of
the conditions subjected the contract and all unfilled
orders to cancellation, the forfeiture of rebates and the
power to obtain the ware manufactured under the letters-
patent from any of the licensed manufacturers. The
purchaser further agreed not to sell any goods on hand
manufactured in accordance with the patents, irrespective
of by whom manufactured, except in accordance with the
prices, conditions and regulations of sale established by
the licensor.

The price list contained a notice to the jobbers' sales-
men that the agreements executed by their companies

required them to resell the various licensed products at no better prices, terms, or other regulations than therein established. And further, as changes, additions and elimi-. nations occurred, new sheets would be issued promptly.

These are the main outlines of the agreements, and, as emphasizing them, Wayman directed the manufacturers at the time they sent out the jobbers' agreements to also send with them a letter containing the following: "It is necessary for you [the jobbers] to execute these contracts before we [the manufacturers] can sell you licensed sanitary enameled ware." This provision was enforced, as indicated by letters in the record. It was also the condition expressed by Wayman in his correspondence with other manufacturers whom he tried to induce to accept licenses and become parties to the agreements. In a letter to a jobber Wayman expressed the hope that the jobber could see his way clear to execute the agreement, as it covered "a matter entirely for the jobbers' benefit." He further stated, "The Cedar Rapids Pump Company of your city have executed the agreement and I hope you will coöperate immediately with your local competitors, which will be much more advantageous than a continuous cut market."

In this statement certain things are prominent. Before the agreements the manufacturers of enameled ware were independent and competitive. By the agreements they were combined, subjected themselves to certain rules and regulations, among others not to sell their product to the jobbers except at a price fixed not by trade and competitive conditions but by the decision of the committee of six of their number, and zones of sales were created. And the jobbers were brought into the combination and made its subjection complete and its purpose successful. Unless they entered the combination they could obtain no enameled ware from any manufacturer who was in the combination, and the condition of entry

was not to resell to plumbers except at the prices determined by the manufacturers. The trade was, therefore, practically controlled from producer to consumer and the potency of the scheme was established by the coöperation of 85% of the manufacturers and their fidelity to it was secured not only by trade advantages but by what was practically a pecuniary penalty, not inaptly termed in the argument, "cash bail." The royalty for each furnace was $5.00, 80% of which was to be returned if the agreement was faithfully observed; it was to be "forfeited as a penalty" if the agreement was violated. And for faithful observance of their engagements the jobbers, too, were entitled to rebates from their purchases. It is testified that 90% of the jobbers in number and more than 90% in purchasing power joined the combination.

The agreements clearly, therefore, transcended what was necessary to protect the use of the patent or the monopoly which the law conferred upon it. They passed to the purpose and accomplished a restraint of trade condemned by the Sherman law. It had, therefore, a purpose and accomplished a result not shown in the *Bement Case.* There was a contention in that case that the contract of the National Harrow Company with Bement & Sons was part of a contract and combination with many other companies and constituted a violation of the Sherman law, but the fact was not established and the case was treated as one between the particular parties, the one granting and the other receiving a right to use a patented article with conditions suitable to protect such use and secure its benefits. And there is nothing in *Henry* v. *A. B. Dick Co.,* 224 U. S. 1, which contravenes the views herein expressed.

The agreements in the case at bar combined the manufacturers and jobbers of enameled ware very much to the same purpose and results as the association of manu-

facturers and dealers in tiles combined them in *Montague & Co.* v. *Lowry*, 193 U. S. 38, which combination was condemned by this court as offending the Sherman law. The added element of the patent in the case at bar cannot confer immunity from a like condemnation, for the reasons we have stated. And this we say without entering into the consideration of the distinction of rights for which the Government contends between a patented article and a patented tool used in the manufacture of an unpatented article. Rights conferred by patents are indeed very definite and extensive, but they do not give any more than other rights an universal license against positive prohibitions. The Sherman law is a limitation of rights, rights which may be pushed to evil consequences and therefore restrained.

This court has had occasion in a number of cases to declare its principle. Two of those cases we have cited. The others it is not necessary to review or to quote from except to say that in the very latest of them the comprehensive and thorough character of the law is demonstrated and its sufficiency to prevent evasions of its policy "by resort to any disguise or subterfuge of form," or the escape of its prohibitions "by any indirection." *United States* v. *American Tobacco Co.*, 221 U. S. 106, 181. Nor can they be evaded by good motives. The law is its own measure of right and wrong, of what it permits, or forbids, and the judgment of the courts cannot be set up against it in a supposed accommodation of its policy with the good intention of parties, and it may be, of some good results. *United States* v. *Trans-Missouri Freight Asso.*, 166 U. S. 290; *Armour Packing Co.* v. *United States*, 209 U. S. 56, 62.

The Colwell Lead Company asserts the legality of the license agreements as the other defendants do, and, besides, urges that it was not engaged in interstate commerce but that it only sold to plumbers and that none of the price restrictions was applicable to it, nor was it

at any time in any relations whatsoever with the other
defendants. It asserts that it was itself a jobber and
therefore had no occasion to deal with jobbers and that
it was not present nor represented at any of the meetings
preceding the license agreements.

It does appear, however, that the company was a
member of the association of manufacturers, an associa-
tion which, we have seen, passed the first resolution in
regard to the license agreement, and the president of the
company when addressed on the subject of the agree-
ment expressed an appreciation of it provided all manu-
facturers should "sign up." He, however, reserved final
judgment until he could go over the matter in detail
with Wayman, who had addressed him, and declared
that he would "be greatly influenced by what other
manufacturers do."

There is a letter in the record, about which, however,
there is some dispute, purporting to have been written
by the president of the company to Wayman, in which
the latter's interpretation of a previous letter was said to
be "entirely correct," and which contained the following:
"We will not require any preferentials below the lowest
price made by the Standard Sanitary Manufacturing
Co." There can be little doubt of the genuineness of
the letter, and it is certain that the company assented
on the twenty-fifth of May, 1910. Its license, however,
was modified in order that it might meet local competition
in New York, its business being, it is contended, mostly
local.

It appears from the testimony that the company was a
manufacturer and a jobber, manufacturing about one-
half of what it sold. As a jobber it bought goods from
other manufacturers but it denies there was an agree-
ment as to prices with such manufacturers.

The testimony as to the state or interstate character
of its business is that it manufactures at Elizabeth, N. J.,

and buys also from other manufacturers and jobbers. It ships from there to its warehouses in New York, Worcester, Mass., and Brooklyn. The trade of its Worcester branch covers about two hundred miles around Worcester, its efforts being to localize its business. It is doubtful, it is testified, if the trade goes beyond Massachusetts, the trade there being circumscribed. Sales in Connecticut are made through the New York office from the ware-rooms.

It is manifest that the Colwell Company was a party to the combination and was also engaged in interstate commerce. The fact that its trade was less general than that of the other manufacturers and jobbers does not take from it the character of an interstate trader. The fact that it was restricted in less degree than the other jobbers, given a certain freedom of competition to meet local conditions in New York, diminishes only the degree of culpability but does not entirely remove it. Indeed it may be said that such freedom does not even diminish culpability. It is a concession, which may be made a means of crushing competition where it is most formidable.

Error is assigned on the action of the Circuit Court in not granting a motion made by defendants for an enlargement of time to take testimony on the ground that they had been prevented, by the action of the Government in instituting criminal proceedings, from properly presenting their defense.

The question arose upon the action of witnesses who were subpœnaed and called by the Colwell Lead Company, they being officers of some of the other manufacturers. The Government apprehending and as it now contends, that the witnesses were called to give them immunity from a criminal prosecution which was then pending in Michigan, notified them that if they testified they would do so at their peril, as immunity could only be claimed by

witnesses for the Government. The witnesses thereupon, upon the advice of counsel, refused to testify, leaving, as it is contended, the Colwell Company particularly, and the other defendants as well, without the evidence such witnesses could have given and which, it is said, they did give subsequently in the criminal trial.

Whether the testimony, if given, would have conferred immunity we are not called upon to determine. The only question is as to the extent of the court's discretion in such circumstances. The Sherman Act provides for a criminal proceeding to punish violations and suits in equity to restrain such violations, and the suits may be brought simultaneously or successively. The order of their bringing must depend upon the Government; the dependence of their trials cannot be fixed by a hard and fast rule or made imperatively to turn upon the character of the suit. Circumstances may determine and are for the consideration of the court. An imperative rule that the civil suit must await the trial of the criminal action might result in injustice or take from the statute a great deal of its power. Besides a suit by the Government there may be an action for damages by a "person injured by reason of anything forbidden by the Act." Must it also wait? Indeed, the reasons urged for the rule, if logically extended, would compel the postponement of the enforcement of the civil remedies until the exhaustion of criminal prosecutions or their expiration by lapse of time. Until either event occurs the danger of incrimination cannot be said to have passed. It is manifest, therefore, that the most favorable view which can be taken of the rights of defendants in such situation is that they depend upon the discretion of the court in the particular case. We find no abuse of such discretion in the case at bar.

*Decree affirmed*