## UNITED STATES v. VEHICULAR PARK-ING, Limited, et al.

### No. 259.

District Court, D. Delaware.

March 28, 1944.

See, also, 52 F.Supp. 749; 52 F.Supp. 751.

Wendell Berge, Asst. Atty. Gen., Ernest S. Meyers and Bartholomew A. Diggins, Sp. Assts. to the Atty. Gen., and E. Houston Harsha, Sp. Atty., of Washington, D. C., and Stewart Lynch, U. S. Atty., of Wilmington, Del., for plaintiff.

Samuel E. Darby, Jr. (of Darby & Darby), of New York City, and William S. Potter (of Southerland Berl & Potter), of Wilmington, Del., for Vehicular group of defendants, and Carl C. Magee.

Lyman W. Sherwood and Clarence J. Loftus (of Loftus, Moore, Olson & Trexler), both of Chicago, Ill., and Edmund S. Hellings, of Wilmington, Del., for Duncan Meter Co. and Donald F. Duncan.

Edwin D. Steel, Jr. (of Morris, Steel & Nichols), of Wilmington, Del., for Dual Parking Meter Co. and George E. Tribble.

C. Edward Duffy (of Logan & Duffy), of Wilmington, Del., and John E. Shepard, of Covington, Ky., for Mi-Co Meter Co. and F. L. Michaels and Alfred R. Miller.

Ivan Culbertson, of Wilmington, Del., and Stanley D. Fisher, of Hartford, Conn., for M. H. Rhodes, Inc., and M. H. Rhodes.

LEAHY, District Judge.

Defendants are charged with violating Secs. 1, 2 and 3 of the Sherman Anti-Trust Act, 15 U.S.C.A. §§ 1–3. This proceeding is brought under Sec. 4, 15 U.S.C.A. § 4, to prevent and restrain further violations.

The government's issue is whether on evidence adduced it has been proven that defendants[1] entered into a combination and conspiracy to restrain and monopolize trade with respect to (1) manufacture, distribution and sale of parking meters and (2) United States letters patent relating to such parking meters.

The government's case stands upon the illegality of the combination and the conspiracy as a whole and not on the illegality of individual combinations of which it is composed. In this type of case the court does not look at any particular act. It looks at the final harvest of all defendants' acts. United States v. Patten, 226 U.S. 525, 544, 33 S.Ct. 141, 57 L.Ed. 333, 44 L.R.A.,N.S., 325; United States v. Reading Co., 226 U.S. 324, 357, 358, 33 S. Ct. 90, 57 L.Ed. 243; United States v. MacAndrews & Forbes Co., C.C., 149 F. 823. Usually in cases of unlawful agreements to restrain trade, difficulties arise in presenting direct evidence. Hence, inferences from circumstantial evidence have been held sufficient to prove the alleged conspiracy. Interstate Circuit v. United States, 306 U.S. 208, 221, 59 S.Ct. 467, 83 L.Ed. 610; Eastern States Retail Lumber Dealers' Ass'n v. United States, 234 U.S. 600, 612, 34 S.Ct. 951, 58 L.Ed. 1490, L.R. A.1915A, 788; United States v. Corn Products Refining Co., D.C., 234 F. 964. But, in the case at bar, by a set of unusual circumstances, the government became possessed of certain definitive writings which contain recorded admissions which point to defendants' participation in the alleged illegal combination.[2]

1. Gestatory Stage. Parkrite and Dual owned patents on parking meters.[3] In

---

[1] Defendants, both corporate and individual, will be identified in this fashion: "Vehicular" or "Vehicular Group" includes defendants Vehicular Parking, Ltd., The Karpark Corporation, Peerless Oil & Gas Company, Vernon F. Taylor, John Howard Joynt, Walter J. Herschede, Guy Kelcey, and E. D. Timberlake.

The term "Rhodes" includes M. H. Rhodes, Inc. and M. H. Rhodes. "Dual" includes Dual Parking Meter Company, Carl C. Magee, and George E. Tribble. "Duncan" includes Duncan Meter Company and Donald F. Duncan. "Mico" includes Mico Meter Company, Alfred R. Miller and Frank L. Michaels. "Parkrite" includes The Parkrite Corporation. "Standard" will include The Standard Meter Corporation and T. W. L. Newsom. Neither of these defendants filed answers to the complaint. They are in default, and have advised the Clerk of the Court

the relief sought by the government as against them may be granted.

[2] See 52 F.Supp. 751 for the government's acquisition of this evidence.

[3] Parking meters are devices used to control traffic by regulating street parking privilege. They limit the period of time during which a particular space may be lawfully occupied by a motor vehicle. The motorist desiring to use restricted municipal space inserts a coin or token for the requisite time he may monopolize such space. In the "automatic" type of meter the insertion of a coin sets the meter in operation. Municipal authorities rewind the mechanism. In the "manual" type, the operator must turn a handle in order to rewind the mechanism as well as insert a coin. In the "free time" meter, a motorist may park without charge for a limited time.

1936 they produced and sold these devices. On August 20, 1936 individual defendant Joynt wrote to individual defendants Taylor and Symington. He prognosticated: "The parking meter business is new and seems to offer ample opportunity for profit. From my study of the Patent aspects it seems, that very little has been done to create a Patent monopoly. It is my opinion that a fair start toward such a monopoly could be gained by pooling the Patents and Patent Applications of Dual Parking Meter Company and Parkrite Corporation." These individual defendants were neither inventors nor owned patents on parking meters. But Joynt made a search in the Patent Office. After this, he wrote Symington and Taylor: "The Patent 1,-752,071 [the Doyle patent] owned by Parkrite Corporation is the only Patent in this field that seems to have claims which in any way might be construed as broadly covering a parking meter of the honor system type. These claims are not such, however, as should be put into litigation because I am afraid they might be invalidated by certain prior art. *At present they are accorded a prima facie validity which could be used to advantage in discouraging competition.* The actual strength of the Patent Monopoly must be gotten from a number of Patents covering individual types of parking meters. If the [Doyle] patent were pooled with the other patents owned by Parkrite Corporation and the several Patents and Patent Applications owned by Dual Parking Meter Company, I feel that this pooling would result in a first rate step toward establishing a dominant position in the parking meter field." (Italics supplied.) They then formed Karpark, a Delaware corporation, which agreed with Parkrite on February 25, 1937 that each would assign "to a patent administrative corporation"—to be organized later—all

their interests in inventions[4] then owned or thereafter acquired relating to parking meters, Karpark to pay Parkrite $100,000, and the administrative corporation, in turn, to grant to Karpark and Parkrite[5] a license to make and vend meters under the corporation's patents and under such terms of sale as determined by such company. This "patent administrative corporation" was formed on March 12, 1937. It was called Vehicular Parking, Ltd., a Delaware corporation, which, though empowered by the State of Delaware, has not since its inception manufactured or sold any product faintly resembling parking meters; and as far as the court can see, "has no facilities for research or development" of such devices. Bluntly, it is a patent holding company.

However, Parkrite wanted to reserve a license if it was to assign its patents to Vehicular. But Joynt immediately said it was "entirely foreign to the tenor of the * * * agreement between Parkrite Corporation and The Karpark Corporation. The essence of that agreement was to put all right, title and interest in these various patents and applications into Vehicular Parking, Ltd. Vehicular, then, would be in a position to establish price control over the entire industry, including Parkrite Corporation." For Parkrite to assign and reserve a license and not assign and then take back a license with conditions "would be disastrous to [Vehicular's] plans in the matter. It would permit Parkrite Corporation to go merrily on its way, without any regard whatever to royalty, price control, or anything else." So concluded Joynt. Time passed. Then Vehicular acquired Parkrite's patents and granted licenses to both Parkrite and Karpark. Months later Parkrite was dissolved. Its assets were absorbed by Karpark.[6]

---

The meters are mounted on standards fixed to the pavement. The parking area adjacent is marked off on the street. The meters require adjunctive apparatus such as standards, collars to connect the standards to the sidewalk, and coin counting mechanisms.

There has been a marked growth in the industry since 1935. In 1938 sales increased from 13,000 meters to approximately 52,600 meters in 1941. Meters sold in 1941 came to $2,821,000. Since 1935 about 160,000 meters have been installed in some 300 cities in this country.

[4] Joynt to Broussard, Vice-President of Parkrite and a director of Vehicular (a

letter dated April 23, 1937, explaining the object of Vehicular): "In order that a price structure may be set up in this country on parking meters, it is absolutely essential that all important manufacturers be brought under a single organization set up to control price. This is the function of Vehicular Parking, Ltd. There can be no exceptions to its control."

[5] Parkrite owned Patents Nos. 1,752,-071 of Woodruff, 2,038,963 of Seeberg, Applications Nos. 69,166 of Woodruff, 86,-045 of Toll, and 112,484 of Woodruff.

[6] Symington resigned as president of Karpark and Vehicular as of September 27, 1938. Two days later Herschede was

832

Now, in 1937 Dual, owning patents on meters, had been leading the industry in sales. Effort was made to have Dual join in and assign its patents to Vehicular with an attractive license back to Dual with a small royalty fee. But Dual refused[7] to join the "patent administrative tribunal."

2. The Combination Commences. By 1940 Vehicular had acquired other patents. The year before Rhodes was selling meters at prices lower than its competitors. Vehicular's negotiations with Rhodes for a price-maintenance agreement were unsuccessful. Thereupon Vehicular advised the cities of New Haven, Connecticut, and Raleigh, North Carolina, which were considering the installation of Rhodes' meters, that such use would constitute an infringement of Vehicular's patents. Vehicular then sued Rhodes in the District of Connecticut charging that the meters used by Rhodes infringed patents held by Vehicular. The purpose of "the suit was to show prospective licensees that it was [Vehicular's] intention to push the matter through litigation with the hope and expectation that those prospective licensees who were 'on the fence' on joining a price stabilization set-up would be swayed into falling in line, even including Rhodes himself." Rhodes then re-opened negotiations, but it objected to a plan of price maintenance until the other competitors[8] were brought into the combination. On January 20, 1940 Rhodes took a license from Vehicular but the price maintenance provisions were to be suspended until Dual and Duncan joined the combination.

Dual was next in line. It had important patents and was, as stated, a leader in sales. Duncan, Mico and Rhodes all thought Dual's participation in the price stabilization plan essential. Stock in Dual was purchased, but Dual still preferred to stand outside. Vehicular finally charged Dual with manufacturing meters which infringed two of Vehicular's patents, and brought suit in this court. Dual's answer avers that Vehicular had conspired with other manufacturers to create an unlawful monopoly in the parking meter industry, it sought to control prices and levy tribute from Dual. Dual countered by bringing an action for infringement in this court against Karpark. While these two suits were pending in 1940, individual defendant Tribble acquired the control stock of Dual, retained Magee as President, and directed the taking of a license from and the execution of the price maintenance agreement with Vehicular, after Dual for $55,000 had first assigned seven of its patents and an exclusive license under three other patents to Vehicular.

Then Duncan joined up. It had agreed to come in when Dual signed as Dual was Duncan's "only mean competition". It was part of the planned technique that Dual and Duncan had to be brought into the fold. Counsel had already advised Duncan that Vehicular's Doyle patent was of doubtful validity and that Vehicular

successor as president of Karpark and later became a director of Vehicular. Joynt's family became part of Vehicular's management in 1939. In turn, Kelcey, Herschede, Timberlake in 1941 took the positions held by Joynt's family.

7 Dual once used the name "Park-o-Meter". Later Symington acquired the trade-mark "Park-o-Meter". Joynt's rationale for this act: "One of the main reasons for acquiring this trade name was to use it as a lever on Mr. Magee [Dual], if such action became necessary. I have felt all along that in order to complete our patent position it is most desirable to bring Dual into the picture. One of the best ways to achieve this result in my mind seems to convince Mr. Magee [Dual] that he is trespassing on certain of our patent and trade-mark rights, and then to point out that it is decidedly to his advantage to obtain a license under these various rights."

8 It is clear that the individual defendants agreed that the industry would be limited to a group of five to seven manufacturers who would become licensees of Vehicular upon the condition that Vehicular would police agreed upon prices and conditions of sale.

Karpark on September 20, 1939 wrote: "I had to assure these gentlemen [Alfred Miller and Frank Michaels, i. e., Mico] that licenses would not be granted to applicants of this nature and only to those who would be very safe to stay in the business and at that we only intend to have from five to seven licensees." An outsider and prospective licensee on November 30, 1940 wrote: "I would, therefore, like to know if a license to manufacture under your group of patents would be available to me, and what the cost of the same would be, and under what patents you can license." He was told by Vehicular: "There is no plan to grant additional licenses at the present time."

was trying to use its patents "as a means to scare the parking meter manufacturers into taking a license rather than be sued." Nevertheless, Duncan executed the necessary papers. With Duncan and Dual both in, this lifted the bar to the operation of the price maintenance agreement with Rhodes.

In 1939, Mico had agreed to the plan but its obligation was not to become effective "until such time as at least five of the seven meter manufacturers mentioned * * * have signed an agreement identically" with the one executed by Mico on September 20, 1939.[9] Later Mico and Vehicular settled certain interference proceedings in the Patent Office (where they were contestants) whereby Mico gave an exclusive license to Vehicular under certain claims of a patent application owned by the individual defendant Michaels, an officer of Mico.

As early as 1937 Standard had expressed a willingness to become part "of a Patent Pool in which tentative plans" were then being discussed; but when the agreement was submitted it contained a provision for the elimination by Standard in the future of all sales of the "free time" meter. Standard refused to execute the agreement. Vehicular then threatened the City of Albany, New York, which was about to purchase meters from Standard, that the use of such meters would constitute infringement of Vehicular's patents. Two months later Standard promised to drop "free time" meters and entered the combination.[10]

3. The Agreements. The agreements are substantially similar and the evidence shows that each contemplated the others. Those portions of the agreements pertaining to prices, terms and conditions for the sale of parking meters, parts, services and accessories between Vehicular, Rhodes, Dual, Duncan, Mico, Karpark and Standard provide:

(1) "Manual" meters would not be sold below $35 and "automatic" meters not below $45.

(2) "Reasonable" prices would be charged for standards, collars, other parts and services.

(3) A 2½% discount would be maximum. 5% interest per annum would be charged on deferred payments.

(4) No trade discounts in the form of free meters.

(5) 40% of the sales price would be the maximum commission payable to salesmen and distributors. No commissions in advance and not more than $75 per week would be paid as selling expense to salesmen.

(6) No free service or maintenance. Guarantees against defective workmanship to be limited to one year.

(7) Installation of meters for trial periods of less than six months prohibited.

(8) No rental of meters.

(9) Giving of a patent infringement bond in excess of $10,000 to cities prohibited.

(10) No deliveries in anticipation of price advances.

(11) Used and reconditioned manual meters not to be sold below $25, such automatic meters not below $35.

(12) Maximum of $15 for trade-in allowance on second-hand meters.

(13) Sales to cities on credit only if 75% of meter income to go to seller until purchase price is paid and payment to be completed within fifteen months.

(14) Minimum prices fixed for manual type of meter not to exceed those established for the automatic type.

(15) Each manufacturer to have an agreement no more favorable than the other.

(16) Violations of agreement subject to fines.

(17) Vehicular to enforce patents held by it against other manufacturers of parking meters.

(18) Corporate defendants to pay Vehicular 4% of the sales price of each meter in order to police the industry.

(19) Agreements to terminate on the expiration date of the last patent listed in the agreements.

(20) Each manufacturer admitted its own meters were within the scope of the

---

[9] Although all of Vehicular's stock is owned by Karpark, nevertheless they entered into the same agreement as the other corporate defendants in order that Karpark might appear to stand on an equal basis with the others.

[10] After Standard's counsel examined the Rhodes form of agreement which had been submitted to Standard for execution, he expressed the opinion that the agreement "plainly on its very face to be an agreement in violation of the anti-trust law."

834

patents held by Vehicular and agreed to mark its meters with the numbers of the patents held by Vehicular.

(21) If any of the pooled patents were held invalid royalty payments to abate.[11]

Duncan was advised by counsel that the agreements were illegal. Standard's counsel was quite explicit. He wrote: "The admitted object of licensor and licensees is to control the industry among themselves, all of it if possible, and if not all then at least most of it. Prices are fixed for everything, even for services and even for standards, whether patented or not. Limitations are fixed as to amount of bond and the bonding period. Minimum prices are even fixed for second-hand meters which, under the law, are absolutely clear of patent monopoly once sold. The agreement runs until the expiration of the last patent in the list. It is not even necessary to consider the future to perceive that within a month the agreement will apply to anything made under the 1923 patent and will successively apply to articles made under the succeeding patents, even after the patents expire and their entire subject matter is free to the public." The evidence indicates that Rhodes, Taylor, Dual, Magee, Kelcey and Joynt were likewise aware of the danger of the price-fixing conditions in the agreement. During 1940 and 1941 defendants met, discussed who should and

who should not join their group, agreed from time to time to lower or increase prices, varied terms and conditions of sale.

■ These acts considered in the light of the fact that defendants controlled 95% to 98% of the parking meter business in the United States disclose an integrated plan to control the manufacture and sale of parking meters.

■ 4. The Patent Privilege. (a) A combination to fix or influence prices is illegal. The reasonableness of the price has no legal justification. Moreover, "price fixing" is not alone the maintenance of identical prices but includes the fixing of minimum prices. The "not less than" clause is what is condemned, especially where the sales price of "not less than" is coupled with regulated and fixed terms conditioning the sale of devices. United States v. Socony-Vacuum Oil Co., 316 U.S. 150, 223, 60 S.Ct. 811, 84 L.Ed. 1129; United States v. Masonite Corporation, 316 U.S. 265, 274, 62 S.Ct. 1070, 86 L.Ed. 1461; United States v. Trenton Potteries Co., 273 U.S. 392, 397, 47 S.Ct. 377, 71 L.Ed. 700, 50 A.L.R. 989; Bauer & Cie v. O'Donnell, 229 U.S. 1, 8, 33 S.Ct. 616, 57 L.Ed. 1041, 50 L.R.A.,N.S., 1185, Ann.Cas.1915A, 150. The conditions of sale agreed upon by these defendants could only have been for the purpose of maintaining price fixing in the industry.[12]

---

[11] But there is no corresponding provision for the termination of the price fixing provisions.

[12] One court concluded that each of the agreements violated Secs. 1 and 3 of the Sherman Act. Vehicular sued Mico for royalties in the Kentucky State court. Mico filed a counterclaim and sought an injunction against Vehicular from collecting from cities paying amounts due Mico. The Kentucky court* said:

"Plaintiff is a Delaware corporation claiming to own itself and in connection with associates, likewise engaged, a number of patents, either already granted or already applied for, used in the construction of parking meter installments in cities desiring such. The two such defendants are engaged in the installation of such plants [meters] operating in the city of Covington, Kentucky. They contract with municipalities throughout the United States and at the time of the filing of this action they had constructed plants [meters] in at least three municipalities in New York, Washington and elsewhere upon which the entire contract price had not been paid. On July 19, 1940 plain-

tiff had prepared a writing styled a "License Agreement" and presented it to defendants for them to sign which they did. That agreement is more or less confused. but when analyzed it appears to be an effort on the part of plaintiff and its associates to control contrary to the provisions of the Sherman Anti-Trust Law, the installation of such plants and the parts of machinery and facilities necessary therefor. One of the terms was that defendants would pay plaintiff four per cent on their contract price for the use of any article owned by plaintiff and they would permit plaintiff to examine their books at any time for the purpose of ascertaining any amount of royalty due it, claiming that such royalty was due it by the contracts supra, it demanded an inspection of defendants' books which they refused followed by this action by plaintiff for a mandatory injunction giving them the right to make such inspection. Defendants' answer denied the material allegations of

---

* Unreported opinion filed July 22, 1942, in Action No. 44,455, Kenton Circuit Court.

■ The grant of the patents here involved was primarily "to promote the progress of science and useful arts." Motion Picture Patents Co. v. Universal Film Mfg. Co., 243 U.S. 502, 510, 511, 37 S.Ct. 416, 418, 61 L.Ed. 871, L.R.A.1917E, 1187, Ann. Cas.1918A, 959. Defendants received merely the subordinate right to exclude trespass by others. Bauer v. O'Donnell, supra. The grant contained no implied license to violate the anti-trust laws. Standard Sanitary Mfg. Co. v. United States, 226 U.S. 20, 49, 33 S.Ct. 9, 57 L.Ed. 107. In Mercoid Corporation v. Mid-Continent Inv. Co., 320 U.S. 661, 64 S.Ct. 268, 271, Mr. Justice Douglas brought these principles into focus when he said: "The grant of a patent is the grant of a special privilege 'to promote the Progress of Science and useful arts.' Const., Art. I, § 8. It carries, of course, a right to be free from competition in the practice of the invention. But the limits of the patent are narrowly and strictly confined to the precise terms of the grant. Ethyl Gasoline Corp. v. United States, 309 U.S. 436, 456, 60 S. Ct. 618, 625, 84 L.Ed. 852; United States v. Univis Lens Co., 316 U.S. 241, 251, 62 S.Ct. 1088, 1093, 86 L.Ed. 1408. It is the public interest which is dominant in the patent system. Pennock v. Dialogue, 2 Pet. 1, 7 L.Ed. 327; Kendall v. Winsor, 21 How. 322, 329, 16 L.Ed. 165; Adams v. Burke, 17 Wall. 453, 21 L.Ed. 700; Motion Picture Co. v. Universal Film Co., supra, 243 U.S. [at] pages 510-511, 37 S. Ct. [at] page 418, 61 L.Ed. 871, L.R.A. 1917E, 1187, Ann.Cas.1918A, 959; Morton Salt Co. v. G. S. Suppiger Co., [infra];

United States v. Masonite Corp., 316 U.S. 265, 278, 62 S.Ct. 1070, 1077, 86 L.Ed. 1461. It is the protection of the public in a system of free enterprise which alike nullifies a patent where any part of it is invalid (Marconi Wireless Co. v. United States, 320 U.S. 1, 58, 63 S.Ct. 1393, 1419, 87 L. Ed. 1731; and see General Electric Co. v. Wabash [Appliance] Corp., 304 U.S. 364, 372, 58 S.Ct. 899, 903, 82 L.Ed. 1402) and denies to the patentee after issuance the power to use it in such a way as to acquire a monopoly which is not plainly within the terms of the grant. The necessities or convenience of the patentee do not justify any use of the monopoly of the patent to create another monopoly. The fact that the patentee has the power to refuse a license does not enable him to enlarge the monopoly of the patent by the expedient of attaching conditions to its use. United States v. Masonite Corp., supra, 316 U.S. [at] page 277, 62 S.Ct. [at] page 1077, 86 L.Ed. 1461. The method by which the monopoly is sought to be extended is immaterial. United States v. Univis Lens Co., supra, 316 U.S. [at] pages 251, 252, 62 S. Ct. [at] pages 1093, 1094, 86 L.Ed. 1408. The patent is a privilege. But it is a privilege which is conditioned by a public purpose. It results from invention and is limited to the invention which it defines. When the patentee ties something else to his invention, he acts only by virtue of his right as the owner of property to make contracts concerning it and not otherwise. He then is subject to all the limitations upon that right which the general law imposes upon such contracts. The contract

the petition, except it admitted that they signed the contracts but under fraud, misrepresentation and a species of legal duress, which need not now be set out here. Furthermore it pleaded the invalidity of the contract as violative of the Sherman Anti-Trust Act, supra. The defendants' motion for the temporary injunction they sought was heard before the trial court by agreement on evidence produced by affidavits. It was shown without material contradiction that the charges made in the answer were true and the court appears to have so found, and since the court found that defendants had not violated the agreement, even if it was valid, and because the Court found the contract invalid under the holding of the Supreme Court of the United States in the case of United States v. Masonite Corporation, 316 U.S. 265, 62 S.Ct. 1070, 86 L.Ed.

1461, it sustained defendants' motion in its cross petition and counter-claim for an injunction restraining plaintiff from in any manner interfering with balance due defendants on contracts theretofore performed by them. This motion seeks a dissolution of that injunction. It was considered by the writer, Judge Fulton, Judge Perry, Judge Rees and Judge Ratliff, and all concur in the conclusion reached that the court properly granted the injunction and that plaintiff's rights were thoroughly protected by the bond required of defendants as well as their undisputed solvency. The Court made no order on plaintiff's motion for the injunction it prayed for and no question involved therein is before us.

"Wherefore, the motion to dissolve the temporary injunction, or to anywise modify it, is overruled."

is not saved by anything in the patent laws because it relates to the invention. If it were, the mere act of the patentee could make the distinctive claim of the patent attach to something which does not possess the quality of invention. Then the patent would be diverted from its statutory purpose and become a ready instrument for economic control in domains where the anti-trust acts or other laws not the patent statutes define the public policy."

Assuming Vehicular's patents are valid, the agreements in suit attempt to extend the lawful patent monopoly in an illegal manner. Defendants cannot by concert of action fix prices for the adjunctive devices obviously not within the claims of the patents, i. e., the coin counters, the standards and collars. Likewise they may not fix price for "specialties". Morton Salt Co. v. Suppiger Co., 314 U.S. 488, 62 S. Ct. 402, 86 L.Ed. 363; B. B. Chemical Co. v. Ellis, 314 U.S. 495, 62 S.Ct. 406, 86 L. Ed. 367; Motion Picture Patents Co. v. Universal Film Manufacturing Co., supra; Carbice Corp. v. American Patents Development Corporation, 283 U.S. 27, 51 S. Ct. 334, 75 L.Ed. 819; Leitch Mfg. Co. v. Barber Co., 302 U.S. 458, 58 S.Ct. 288, 82 L.Ed. 371. In short, a patent may not be utilized to control economically a non-patented device. When Vehicular attempts to control the making and vending of products other than the patented meter, such control is obviously not bottomed on the patent statute and is far beyond the claims upon which the lawful monopoly rests. Restrictions on price for servicing meters, and prohibition against free servicing are not protected by any of the claims found in Vehicular's collection of patents; such restrictions are illegal. Morton Salt Co. v. Suppiger Co. and B. B. Chemical Co. v. Ellis, supra. At one time (February 24, 1941) Magee wrote to Joynt and said "Whoever was advising you that $4.50 was a fair price to add for specialties obvious-

ly knew quite exactly what he was talking about. Our bid went in several days ago, and *before you specified a price of $4.50* the bid was within a few cents of $4.50 added for these special things. May I suggest to you that this fixing of a price for specialties comes dangerously near to price fixing * * *". A typical price list filed by Karpark, for example, with Vehicular is set out in the marginal note.[12a] In Mercoid Corporation v. Minneapolis-Honeywell Regulator Co., 320 U.S. 680, 64 S.Ct. 278, 279, Mr. Justice Douglas again said: "Minneapolis-Honeywell has licensed five of its manufacturing competitors under the Freeman patent. The licensees are granted a non-exclusive right under the patent to make, use and sell a 'combination furnace control' which is defined as a thermostatic switch usable for a Freeman installation and designed in one unit to control the fan and limit circuits. Royalty payments to Minneapolis-Honeywell are based on the sales of the combination furnace controls, although the Circuit Court of Appeals found that the only Minneapolis-Honeywell control 'which gets protection as a result of the licenses is the control usable only for a Freeman type of installation.' Each licensee is required to insert in its catalogues or other sales literature and to attach to each combination furnace control sold a notice to the effect that the control includes a license for one installation of the Freeman heating system. The licenses establish minimum prices for the sale of the controls; and these prices must not be cut by the licensees through the inclusion of 'extras' or through the reduction of charges for services. Price lists are attached governing sales to manufacturers, jobbers, wholesalers, and dealers. Equal terms to all licensees are provided. * * * The legality of any attempt to bring unpatented goods within the protection of the patent is measured by the anti-trust laws not by the patent law. For the reasons stated in Mercoid v. Mid-Continent

12a                    September 10, 1941
Change in Price of Meters, and Prices for New Series

| Model | Head Alone | Standard and Collar | Complete Meter f.o.b. Cincinnati |
|---|---|---|---|
| H–4 | $45.00 | $2.00 | $47.00 |
| H–PN | 50.00 | 2.00 | 52.00 |
| H–PPN | 50.00 | 2.00 | 52.00 |
| K–4 | 54.00 | 2.00 | 56.00 |
| K–PN | 59.00 | 2.00 | 61.00 |
| K–PPN | 59.00 | 2.00 | 61.00 |

| Model | Head Alone | Standard and Collar | Complete Meter f.o.b. Cincinnati |
|---|---|---|---|
| HS–4 | $56.00 | $3.00 | $59.00 |
| HS–PN | 62.50 | 3.00 | 65.50 |
| HS–PPN | 62.50 | 3.00 | 65.50 |
| KS–4 | 63.00 | 3.00 | 66.00 |
| KS–PN | 69.50 | 3.00 | 72.50 |
| KS–PPN | 69.50 | 3.00 | 72.50 |

Investment Co., supra, the effort here made to control competition in this unpatented device plainly violates the anti-trust laws, even apart from the price-fixing provisions of the license agreements."

▆ (b) Moreover, owners of patents may not enter into a combination to use their patents to eliminate competition where the resultant restraint of trade arises from the combination and not from the exercise of the right granted by the patents to exclude others. Blount Mfg. Co. v. Yale & Towne Mfg. Co., C.C., 166 F. 555; Standard Sanitary Mfg. Co. v. United States, supra; United States v. Motion Picture Patents Co., D.C., 225 F. 800, appeal dismissed 247 U.S. 524, 38 S. Ct. 578, 62 L.Ed. 1248; United States v. Hartford-Empire Co., D.C., 46 F.Supp. 541. For example, in National Harrow Co. v. Hench, C.C., 76 F. 667, 669, harrow manufacturers controlling 90% of the industry formed a non-manufacturing patent holding company and assigned their patents to it. Each assignor received a license to make and vend the same style of harrows which were manufactured previously. The patent holding company fixed minimum prices and uniform conditions of sale. The court said: "It is true that a patentee has the exclusive control of his invention during the life of the patent. He may practice the invention or not, as he sees fit, and he may grant to others licenses upon his own terms. But where, as was the case here, a large number of independent manufacturing concerns are engaged in making and selling, under different patents and in various forms, an extensively used article, competition between them is the natural and inevitable result, and thereby the public interest is promoted. Therefore, a combination between such manufacturers, which imposes a widespread restraint upon the trade, and destroys competition, is as injurious to the community, and as obnoxious to sound public policy, as if the confederates were dealing in unpatented articles." This Circuit in affirmance (3 Cir., 83 F. 36, 38, 39 L. R.A. 299) said: "It is manifest, * * * that the purpose of the parties was to form a combination between the various manufacturers of these harrows, to prevent competition in business and enhance prices; and such is the effect of their agreement. The corporation, provided to hold the legal title of the several patents, is merely an instrument to effect this object. * * * The result would be the same in legal contemplation if the corporation and licenses had been dispensed with, and the contract had provided simply, as it does, for combination and restraint of competition." Reference may also be made to Standard Sanitary Mfg. Co. v. United States, supra, where one individual secured control of three patents involving a device for enameling iron ware. Manufacturers of 85% of all sanitary iron ware accepted licenses under the patents whereby prices were fixed and terms and conditions of sale determined by the licensor and a committee of the manufacturer-licensees. Such a combination was condemned under the anti-trust laws.

The roles played by the individual in Standard Sanitary Mfg. Co., by the patent holding corporation in Hench, and by Vehicular under the plan sub judice are without legal distinction.

This Circuit's holding in the Hench case was, however, greatly weakened several years later in Bement & Sons v. National Harrow Co., 186 U.S. 70, 22 S.Ct. 747, 46 L.Ed. 1058, where Mr. Justice Peckham was of opinion that the patentee may exploit his grant by imposing such regulations as he chooses and that the right to control price is a valid condition of his right to vend. Freedom of contract is the primary postulate. The Bement case was followed by United States v. General Electric Co., 272 U.S. 476, 47 S. Ct. 192, 197, 71 L.Ed. 362. The defense in the case at bar rests, if not wholly at least substantially, on this case. But, even if the defendants here were able to get by the doctrine of the Mercoid cases, supra, the distinctions between General Electric and Hench and Standard Sanitary are sharp.

General Electric [13] was engaged in the manufacture of its patented device; and

---

[13] While General Electric had other licenses they were not before the court. In the lower court (D.C., 15 F.2d 715, 716) it was said: "It [General Electric] has also licensed some 13 other manufacturers * * * but as to these 13, no complaint is made, and their activities as well as their relations to the General Electric Company are not involved in this controversy." Cf. Sup.Ct.Record pp. 90, 91, for a stipulation that in the other licenses there were no provisions as to prices and conditions of sale.

to protect its legal monopoly the Supreme Court held that it had the right to insist that its licensee would not undersell it in competition.[14] Chief Justice Taft said: "One of the valuable elements of the exclusive right of a patentee is to acquire profit by the price at which the article is sold. The higher the price, the greater the profit, unless it is prohibitory. When the patentee licenses another to make and vend and retains the right to continue to make and vend on his own account, the price at which his licensee will sell will necessarily affect the price at which he can sell his own patented goods. It would seem entirely reasonable that he should say to the licensee, 'Yes, you may make and sell articles under my patent but not so as to destroy the profit that I wish to obtain by making them and selling them myself.'" From this language it appears that the decision in the General Electric case is predicated upon the patentee making and vending the patented device; and it is permissible, therefore, for the patentee to grant a license on the condition that the licensee will not sell the patented product at a lower price than the patentee. There is nothing in that case which indicates that the patentee can agree with group-licensees to fix the price at which all may sell.[15] Karpark owning Vehicular must sell at the same price as other licensees. The price fixing, then, is for the benefit of the licensees—not to protect Vehicular's sales of meters because Vehicular is not engaged in manufacturing and sale.

Where the defendant corporations control from 95% to 98% of an industry, with threat of competition removed, upon agreement that others will be refused "to join the fold", a tight monopoly exists, especially where the parties to the agreement before they became parties to it were in free and open competition and sold the

---

[14] General Electric's price-fixing in comparison with Vehicular's:

| G.E. | Vehicular |
| --- | --- |
| 1. One agreement before the Supreme Court. | 1. 6 agreements here. |
| 2. Lack of concert between licensor vis-a-vis licensee. | 2. Concert of action between licensor and licensees. |
| 3. Licensor-manufacturer. | 3. Vehicular—no manufacturer. |
| 4. Licensee's selling price conditioned to patentee's reward. | 4. Vehicular's income conditioned upon 4% royalty to compensate it to "police" the industry. Licensees' selling price with no relationship to Vehicular's (as patentee) reward. |
| 5. Litigated Patents, considered basic. | 5. Unadjudicated patents, admittedly of doubtful validity and scope. |
| 6. Price fixing placed on patented product. | 6. Price fixing extended to unpatented parts and services. |
| 7. Price fixing ends with decree of patent invalidity. | 7. Where finding of patent invalidity no termination of price fixing. |

[15] Bement v. National Harrow Co., 186 U.S. 70, 22 S.Ct. 747, 46 L.Ed. 1058, defendants' other reliance, is analogous to the General Electric case. There the court considered one patent license and held the patentee could fix the selling price of the licensee. In the later case of Standard Sanitary Mfg. Co. v. United States, 226 U.S. 20, at page 48, 33 S.Ct. 9, at page 14, 57 L.Ed. 107, the Supreme Court fixed the limits of the Bement decision by stating: "There was a contention in that case that the contract of the National Harrow Company with Bement & Sons was part of a contract and combination with many other companies and constituted a violation of the Sherman law, but the fact was not established, and the case was treated as one between the particular parties, the one granting and the other receiving a right to use a patented article with conditions suitable to protect such use and secure its benefits."

devices at prices to the public much below those established by the agreement.[16] An aggregation of corporations or individuals, as such, do not necessarily approach an illegal monopoly where its unquestioned control absorbs 95–98% of the business of a particular industry. But, where the aggregation submit to rules (and fines for the violation of such rules) to prevent competition inter sese and from outsiders, agree who should become members of the family and who should never be adopted, the product and services each should traffic in, the prices and terms and conditions of sale of such, and the compensation each shall pay to persons to attempt to sell the product, then such a business manifestly "takes away the freedom of action of [its] members." For, in such situations, "the combination is in reality an extra-governmental agency, which prescribes rules for the regulation and restraint of interstate commerce, and provides extra-judicial tribunals for determination and punishment of violations, and thus 'trenches upon the power of the national legislature and violates the statute.'" Fashion Originators Guild v. Federal Trade Commission, 312 U.S. 457, 668, 61 S.Ct. 703, 707, 85 L.Ed. 949.

Indeed, patent pools per se are not condemned by either federal statutory or decisional law, except where the conjoint design of persons in such acquisition and pooling is to restrain trade. Standard Sanitary Mfg. Co. v. United States; United States v. Motion Pictures Patents Co.; United States v. New Departure Mfg. Co., D.C., 204 F. 107; National Harrow Co. v. Hench; Blount Mfg. Co. v. Yale & Towne Mfg. Co., supra. See, United States v. Hartford-Empire Co., D.C., 46 F.Supp. 541. In the case at bar we find one defendant writing another: "The Patent 1,752,071 [Doyle patent] owned by Parkrite Corporation is the only Patent in this field that seems to have claims which in any way might be construed as broadly covering a parking meter of the honor system type. These claims are not such, however, as should be put into litigation because I am afraid that they might be invalidated by certain prior art. At present they are accorded a prima facie validity which could be used to advantage in discouraging competition. The actual strength of the Patent monopoly must be gotten from a number of Patents covering individual types of parking meters. If the [Doyle patent] were pooled with the other Patents owned by Parkrite Corporation and the several Patents and Patent Applications owned by Dual Parking Meter Company, I feel that this pooling would result in a first step toward establishing a dominant position in the parking meter field. This position most certainly should be strengthened by other Patents covering a variety of different types of meters which occur to the imaginative mind * * * The parking meter business is new and seems to offer ample opportunity for profit. From my study of the Patent aspects it seems that very little has been done to create a Patent monopoly. It is my opinion that a fair start toward such a monopoly could be gained by pooling the Patents and Patent Applications of Dual Parking Meter Company and Parkrite Corporation. The position then should be strengthened by other Patents and Applications covering different types of parking meters which might be conceived." This language is a negation of lawful individual monopoly granted by the patent statutes. The next year we find the author of the foregoing letter writing again: "In order that a price structure may be set up in this country in parking meters, it is absolutely essential that all important manufacturers be brought under a single organization set up to control prices. That is the function of Vehicular Parking, Ltd." Such acquisition—for purposes of monopolizing and discouraging competition —failed to meet the favor of Judge Schoonmaker in Stewart-Warner Corp. v. Staley, D.C., 42 F.Supp. 140, 146. He said: "The allegation is to the effect that plaintiff bought up practically all patents

---

16 E. g. minimum prices * agreed upon in 1940 and 1941:

| Automatic Meters | | Manual Meters | | Used & Reconditioned Automatic Meters | | Same Kind of Manual Meters | |
|---|---|---|---|---|---|---|---|
| 1940–1941 | | 1940–1941 | | 1940–1941 | | 1940–1941 | |
| $45 | $50 | $35 | $39 | $35 | $40 | $25 | $29 |

* In addition maximum trade discounts are fixed, cash discounts, interest on deferred payments, and trade-in allowance are agreed upon. Free service, of course, was to be abolished.

in the lubricating-equipment business, not for the purpose of marketing the devices covered by the patents, but for the purpose of intimidating and overwhelming and coercing the trade into dealing only with the plaintiff. If so, that would constitute a violation of the Sherman Act." Judge Schoonmaker's is the correct interpretation of the limits of the patent statutes in the light of the anti-trust laws.

(c) Another facet of defendants' conduct is found in Vehicular's insistence upon Standard eliminating the manufacture and sale of "free-time" meters—the result of which would benefit all licensees—which Standard agreed to do. This circuit has held that the patent owner may not exact such a condition. In National Lockwasher Co. v. George K. Garrett Co., Inc., 3 Cir., 137 F.2d 255, 256, it was said: "So what we have here, assuming the facts as above stated, is a patentee who gives a license to a manufacturer for a stipulated consideration, part of the consideration being that the licensee will abstain from manufacturing any other kind of non-tangling spring washers except those covered by the license." Under these circumstances Judge Goodrich was of the view that "We think the instant case, on the facts as the defendant represents them, falls within the principle of the cases cited [Standard Sanitary Mfg. Co. v. United States, supra, and United States v. Univis Lens Co., 316 U.S. 241, 62 S.Ct. 1088, 86 L.Ed. 1408] to the extent that the patentee is using the lawful monopoly granted by the patent as a means of suppressing the manufacture and sale of competing unpatented articles. It is not creating for itself a monopoly for unpatented goods, as in some of the cases cited. But it is attempting by means other than that of free competition to extend the bounds of its lawful monopoly to make, use and vend the patented device to the extent where such device would be the only one available to a user of such an article. This monopoly is obviously not covered by the patent."

5. Participation. Duncan, for example, in its brief says that it entered into its agreement with Vehicular "under duress and under protest." Evidence in support of this position may be relevant in support of Duncan's cross-claim against Vehicular. But with the exception of Vehicular neither Duncan nor any of the remaining defendants—both corporate and individual—introduced any evidence to controvert the government's charges of violation of the Sherman Act; and clearly there is abundant evidence to show participation by all defendants. Dual, however, takes the position that, even after the license agreement as to it became effective, it broke the traces and engaged in competitive practices not in accordance with the conditions of the license agreements. Still, the evidence shows Dual's participation in the combination. It will be held, therefore, to have intended the objective consequences of its acts and "cannot be heard to say the contrary." United States v. Masonite Corp., 316 U.S. 265, 62 S.Ct. 1070, 1076, 86 L.Ed. 1461. As for Tribble's [17] participation, reference is simply suggested to his correspondence with Joynt, and his attendance at the various meetings of the defendants where sales methods, prices and amendments to the license agreements were discussed. The formal findings filed simultaneously herewith recite with particularity the participation of each of the defendants, both corporate and individual. Those findings are based upon the proposition that, insofar as the

---

[17] Tribble argues that the government predicates the liability of all individual defendants upon a violation of Sec. 14, 15 U.S.C.A. § 24, of the Clayton Act, and that the only authority which this court has to enjoin under Sec. 14 is that found in Sec. 15 of the Clayton Act, 15 U.S.C.A. § 25. Hence, inasmuch as the jurisdiction here has been invoked under Sec. 4 of the Sherman Act to prevent violations of Secs. 1, 2 and 3 of that Act, no liability against Tribble, for example, can be predicated for a violation of Sec. 14 of the Clayton Act, and which may only be enjoined by a proceeding brought under Sec. 15 of that Act.

The court agrees with the government that this is no reason against entering a judgment against the individual defendants. The Clayton Act was enacted after the Sherman Act. Sec. 1 of the former defined "anti-trust laws" to include the Sherman Act. Sec. 14 of that Act provides that any violation of the anti-trust laws by a corporation "shall be deemed" also that of the individual directors, officers or agents involved. But Sec. 14 of the Clayton Act is not relied upon by the government, for its application in the instant case is superfluous inasmuch as Tribble, for example, and others of the corporate defendants' officers and directors are named as defendants and Sec. 4 of the Sherman Act is applicable and is the government's reliance.

individual defendants go, in this type of case "it is the court's duty to look at the whole picture, not individual figures in it." As stated by Judge Goodrich in United States v. Pullman Co., D.C.E.D.Pa., 50 F. Supp. 123, 135: "We have endeavored in the earlier portions of this opinion to assemble the whole picture composed as it is of many parts, some of which singly might be without legal significance. The sum total, it is clear, constitutes a complete domination by the defendants of a limited but important market. They have full control, they have the power to exclude, they have exercised the power and they have by all this violated the provisions of the Sherman Act."

6. Relief. In the course of this litigation, several of the defendants have opened fire on each other. At pre-trial conferences the parties agreed (upon the court's suggestion) that these internecine conflicts temporarily cease until the government, which had no interest in this self-slaughter, tried its case against all the defendants.[18] There remains undetermined, then, (a) Vehicular's objections to certain of Duncan's interrogatories; (b) Vehicular's objection to Duncan's motion to amend its cross-claim; Vehicular's motions to strike both cross-claims of Duncan and Mico. These matters should again be postponed until after the government obtains relief.

The conclusion is reached that there has been a violation of the Sherman Act as charged. The government's prayers are that defendants should be enjoined from entering into further agreements containing any of the restrictions contained in the present agreements, for to permit any type of licensing system would invite abuses through stealth and concealment, and the government should not be required to keep policing defendants' licensing plans. The government's attorneys have ably demonstrated that here is an illegal combination and restraint, by patent abuse, over an "infant" industry and to restore a broad base of competition in the parking meter industry the court must decree that the licensee system in suit is void and that the future performances thereunder be effectively enjoined. They argue that the court may not only "restrain" but also "prevent" violations of the Act; and the only way effectually to dissolve the monopoly is to remove the source of the monopoly power, viz., enjoin defendants from instituting patent infringement suits and to compel the patent-owning defendants to give all applicants royalty-free and unrestricted licenses. Such relief was substantially granted in United States v. Hartford-Empire, supra. That decision is awaiting review in the Supreme Court.

The court suggests that the government form a decree. At the moment, no necessity appears that it be directed against the individual defendants. "Where corporate practices are forbidden or ordered the usual inclusion of the corporate defendants, and their directors and officers is sufficient." United States v. Pullman Co., supra. After the formulation of the decree, defendants will be heard on eliminations or additions. The reason for the suggested procedure is that, at this time, I am not certain the patents in suit should, as a practical matter, be virtually cancelled by the inclusion in the proposed decree of the provisions commanding royalty-free licensing. I have no doubt that there may be judicial death-sentence of a patent in a proper case, but I must be convinced that *this* is the case.

Findings of fact and conclusions of law have been filed in conformity with Rule 52(a) of the Rules of Civil Procedure, 28 U.S.C.A. following section 723c.

---

[18] Under the present state of the pleadings we have a cross-claim of F. L. Michaels and A. R. Miller (Mico) against Vehicular for the cancellation of their several agreements; cross-claim of Duncan against the Vehicular group for a decree that Duncan was a victim of "fraud and duress" and that Vehicular's patents do not cover Duncan's devices and for injunctive relief and recovery of royalty payments.

As mentioned, Standard is in default and by default admits it has been a participant and a member of the conspiracy.