**UNITED STATES of America,**
**Plaintiff,**

v.

**The L. D. CAULK COMPANY, Coe Laboratories, Inc., Dental Perfection Company, and Stanley E. Noyes, Defendants.**

**Civ. 1372.**

United States District Court,
D. Delaware.

Dec. 2, 1954.

See also D.C., 114 F.Supp. 939.

Leonard G. Hagner, U. S. Atty., Wilmington, Del., Stanley N. Barnes, Asst. Atty. Gen., Julius C. Renninger, James J. Coyle, Marcus A. Hollabaugh and William L. Maher, Sp. Assts. to Atty. Gen., for the United States.

Aaron Finger, Richards, Layton & Finger, Wilmington, Del., and Charles M. Thomas, Washington, D. C., for the L. D. Caulk Co.

Hugh M. Morris, Morris, Steel, Nichols & Arsht, Wilmington, Del., and Charles V. Hildebrecht, Brown, Jackson, Boettcher & Dienner, Chicago, Ill., for Coe Laboratories, Inc.

Arthur G. Connolly and Thomas Cooch, Connolly, Cooch & Bove, Wilmington, Del., H. Calvin White, Los Angeles, Cal., and C. Willard Hayes, Cushman, Darby & Cushman, Washington, D. C., for Dental Perfection Co. and Stanley E. Noyes.

RODNEY, District Judge.

This is a civil action brought by the United States of America under Section 4 of the Sherman Anti-Trust Act, 15 U.S.C. §§ 1, 2 and 4.

The complaint charges the defendants and a co-conspirator with combining and conspiring to restrain and monopolize trade and commerce in the manufacture and sale of alginate dental impression material, in violation of Sections 1 and 2 of the Sherman Act.

As a result of a pre-trial conference it was seen that there existed no substantial controverted questions of fact, but the issue consisted in the conclusions to be drawn from the admitted facts. Stipulation of facts was agreed upon by the parties and all parties have moved for summary judgment. It is agreed that the matter shall be disposed of upon consideration of the stipulated facts with the documents comprising a part thereof and the original pleadings in the case.

It is clear and admitted that an antitrust case is an appropriate proceeding for the application of summary judgment proceedings where the parties have stipulated the facts and the documents on which they respectively rely.[1]

The case concerns the use of alginate impression material used by the dental profession in obtaining impressions for use in connection with the manufacture and fitting of false or substituted teeth. The three defendants, L. D. Caulk Company, Coe Laboratories, Inc. and Dental Perfection Co., are among the largest producers of alginate impression material. The individual defendant, Stanley E. Noyes, was the predecessor of Dental Perfection Co. Prior to April, 1948, Noyes was engaged in business in an unincorporated capacity as Dental Perfection Company. Since it does not appear that his interests are distinct from that company since its incorporation, he will not herein be separately discussed.

Prior to 1930 various materials such as bees-wax, plaster of Paris and some so-called "compounds" were used for the taking of dental impressions. These were inelastic and unsatisfactory. In the early 1930's a type of impression material formed by the use of agar-agar was developed. This was manufactured from a sea-weed found almost exclusively in the coastal waters of Japan. This in turn was not entirely satisfactory for the alternate transmutation from a gelatinous to a solid condition could only be brought about by the application of heat and cold resulting in discomfort and danger to the patient. When World War II compelled the Government to limit the use of agar-agar to military uses the search for an alternate—a better and a cheaper material—was accentuated.

The search for the new, better and cheaper impression material resulted in the granting of several patents, the first and most important of which was issued July 15, 1941 to Sidney William Wilding, an Englishman, on an application filed September 18, 1939. Around this patent,

1. International Salt Co. v. United States, 332 U.S. 392, 68 S.Ct. 12, 92 L.Ed. 20; Associated Press v. United States, 326 U.S. 1, 65 S.Ct. 1416, 89 L.Ed. 2013; United States v. General Instrument Corporation, D.C., 87 F.Supp. 157, 165; Fox v. Johnson & Wimsatt, 75 U.S.App.D.C. 211, 127 F.2d 729; Trinity Universal Ins. Co. v. Woody, D.C., 47 F.Supp. 327.

and its use, cluster most of the contentions of the parties. The Wilding patent was assigned to Amalgamated Dental Manufacturing Company, Limited, of England, and an alleged co-conspirator in this case. The alginate impression material resulting from the Wilding and other patents is also developed from a species of sea-weed, but one which is found in plentiful quantities in a number of places. It had certain advantages over the agar-agar product in that by an ordinary mixture with water a material could be placed in the patient's mouth and then removed, retaining its shape and accuracy and without liability for suffering and of danger.

Also listed in the case are a Vallandingham patent now owned by Coe and four Noyes patents and a Lochridge patent owned by Dental Perfection.

Because, however, the contentions of the Government grow out of the circumstances connected with the Wilding patent, so chief consideration will be given to that patent. That such patent, its use and matters flowing from it constitute the basis of the plaintiff's case is clearly apparent. I shall briefly state the facts as they appear to me.

Early in 1940 Caulk, struggling for want of agar-agar or of a satisfactory substitute, and hearing of Wilding's patent application, started negotiations with Amalgamated, looking toward a license under the Wilding patent. These negotiations culminated on February 5, 1942 in Caulk's receiving an exclusive, non-assignable license on a 10% royalty basis. Such license was operative throughout the United States, Canada and three countries of South America, together with the right to sell in other countries of the Western Hemisphere upon a royalty basis. This license from Amalgamated to Caulk, while exclusive in nature, did not give to Caulk the right to sub-license. The license required Amalgamated to exercise reasonable diligence "in the institution and prosecution of suits for infringement."

Coe comes now into the picture. Since February 17, 1941 Coe had had an exclusive license from one Shaw and one Lineer to manufacture a dental impression material according to a formula or patent of Shaw and Lineer. The Government was facing a critical shortage of agar-agar and requested Coe to procure an alginate substitute. Coe then learned of the Wilding patent, and on April 10, 1942 inquired of Amalgamated as to the terms of a license which it desired. Coe in that inquiry stated that it knew Amalgamated might consider the process then used by Coe as an infringement of the Wilding patent held by Amalgamated. Without waiting for a reply to its inquiry, Coe wrote to Shaw concerning the Wilding patent and its possibly narrow coverage and intimating that Coe could provide substitutes for certain ingredients of the Wilding patent. So the Government in its brief states that at the very outset of the development of a new industry Coe attempted to pre-empt the alginate dental impression field to itself. This is only important to the extent that it is the first intimation of the Government's claim that a single individual's desire to attain the exclusive right to manufacture a given article is either illegal or questionable.

In answer to the request of Coe to Amalgamated for a license, Caulk, which then had an exclusive license as to the Wilding patent, and with the approval of Amalgamated, granted a non-exclusive, non-assignable license to Coe dated October 27, 1942. This license was exercisable "throughout the United States of America" and provided a royalty basis of 15% of the wholesale selling price, or an overriding royalty of 5%. The license was expressly limited as to time and by its terms became null and void "at a date six months after cessation of hostilities between the United States and Germany, Italy and Japan." In passing it may be noted that by this sub-license of October 27, 1942, there was voluntarily given by Caulk to Coe a strongly competitive use of the Wilding patent where none had theretofore existed and where no competition could be required of Caulk. It rather clearly appears that this license to

Coe was traceable to a request of the United States War Production Board.

To this point there is no evidence of any conspiracy to violate any law nor of any matter of an unusual nature covering a patent.

After the granting of the sub-license to Coe on October 27, 1942, nothing worthy of comment transpired for some time. Coe, acting under its sub-license and paying substantial royalties for the coverage of the patent, was becoming restive as to the alleged infringements of the Wilding patent by third parties who thus were placed in favorable competition by the use of the coverage of the patent with no expense of royalties. In June, 1944 the alleged infringements of the Wilding patent by Dental Perfection were forcibly presented and it was stated by Coe to Caulk that Dental Perfection's output exceeded the combined output of Caulk and Coe. These suggestions culminated in an action in the Southern District of California on May 11, 1945, brought by Amalgamated against Stanley E. Noyes, doing business as Dental Perfection Co. Caulk was made an involuntary plaintiff owing to its understanding of a prejudice against patents in the dental profession.

At this chronological stage the Government says in its brief that the facts to this point "clearly show that the conspiracy was actually in the process of formation." The Government says, "The conspiracy arose as a result of the attempts of each of the defendants to individually control the alginate dental impression material industry." To me, to this point, there is not the slightest evidence or suggestion of an unlawful conspiracy unless it be found in the zeal to commercially use a lawfully issued patent and a desire of a royalty-paying licensee to confine the use of a patent to others similarly situated as to the payment of royalties and thus avoid unfair competition by those unlawfully using the patent without payment of royalties.

■ Mention is made of this chronological status merely because such status at this point was urged by the Government. I am in entire accord with the Government that a conspiracy is not to be viewed from a consideration of its component parts which may be unobjectionable in themselves and taken separately, but from an examination of the whole of the elements or a "panorama" of all the acts and circumstances.[2]

While one should not, by attention to specific actions or isolated conditions, fail to see the over-all picture (the failure to see the woods for the trees, of the adage), yet the component parts cannot be ignored, for without these component parts there is no "panorama" or over-all picture at all.

Dental Perfection having been sued in May, 1945 for infringement of the Wilding patent now comes into the picture. Dental Perfection, for many years, had been a leading producer of dental impression material. It allegedly utilized the teaching of the Wilding patent even before Caulk got into actual operation under its exclusive license. As early as October 28, 1942, Caulk complained to Amalgamated that Dental Perfection was doing a "land office" business in material that seemed an infringement of the Wilding patent, and by June of 1944 Coe complained that Dental Perfection's output exceeded the total output of Caulk and Coe. So the infringement suit of Amalgamated against Dental Perfection came into being in May of 1945.

In May, 1947 the exclusive license held by Caulk from Amalgamated was somewhat changed. Theretofore Caulk had had no right to grant sub-licenses for the Wilding patent and the license to Coe had been by the express authority of Amalgamated. In May, 1947 Caulk's exclusive license of February 5, 1942, was amended.

2. United States v. Patten, 226 U.S. 525, 544, 33 S.Ct. 141, 57 L.Ed. 333; Swift and Company v. United States, 196 U.S. 375, 396, 25 S.Ct. 276, 49 L.Ed. 518; American Tobacco Co. v. United States, 328 U.S. 781, 809, 66 S.Ct. 1125, 90 L. Ed. 1575, and many other cases, particularly United States v. Vehicular Parking, Limited (in this Court), D.C., 54 F.Supp. 828.

Caulk's royalty was reduced from 10% to 5% and Caulk was given "the exclusive right to grant sub-licenses of licensee's choosing throughout the United States of America." The royalty rate for sub-licenses was reduced to 10%.

The suit of Amalgamated against Noyes was settled in July, 1947. By the final decree Noyes or Dental Perfection admitted the validity of the Wilding patent and that such patent had been infringed by Noyes. Dental Perfection obtained a license from Caulk to use the Wilding patent upon paying 10% royalty and Dental Perfection was absolved from a claim for damages for past infringement. Some mention has been made that the settlement of the Dental Perfection litigation may have been partly induced by reason of the fear of the inherent weakness of the Wilding patent. This fear is, perhaps, the accompaniment of any patent litigation. The suggestion loses much of its force in view of the subsequent and complete validation of the Wilding patent in the later Getz litigation hereinafter considered.

In view of the claims of the United States, subsequently considered, certain negotiations leading to the settlement of the Dental Perfection litigation may not be without interest and importance. Dental Perfection sought to have inserted in the agreement a limitation of the right of Caulk to grant sub-licenses and to give Dental Perfection a measure of control of the issuance of such licenses. This was emphatically refused and Caulk insisted on its sole right to determine the issuance of sub-licenses. Dental Perfection sought also the right to designate the infringers that Amalgamated was obligated to sue on the application of Caulk. This also was denied, and Item 7 of the license agreement between Caulk and Noyes dated July 2, 1947 provides:

"Caulk agrees to request Amalgamated to institute and prosecute with reasonable diligence infringement suits for unlawful infringement of patent 2,249,694, provided, however, that Caulk shall have sole discretion in selecting the suit or suits which it may request Amalgamated to institute for the unlawful infringement of said patent."

In passing, and since Caulk, Coe and Dental Perfection are alleged as co-conspirators, it may be material to state that the settlement between Caulk and Dental Perfection and the issuance of the license to Dental Perfection, Coe was not consulted and was, indeed, in complete ignorance of the terms of the license to Dental Perfection until after the license was granted and the litigation concluded.

Immediately after Dental Perfection had obtained its sub-license and, by reason of its large output, was paying very substantial royalties, Dental Perfection complained of other infringers of the Wilding patent being allowed thus to infringe without being called to account. These complaints continued unabated and seemingly resulted in the Washington meeting of October 29, 1947 which the United States claims was the "focal point" of the conspiracy. To this "focal point," then, attention must now be given.

There seems to be no doubt that prior to the Washington meeting on October 29, 1947 the attention of Amalgamated, the owner of the patent, Caulk, the exclusive licensee, and Coe and Dental Perfection, royalty-paying sub-licensees, had been engaged by the activities of a number of individuals as indicating infringements of the Wilding patent. Coe, after becoming a royalty-paying sub-licensee, was importunate in its demands that infringers of the patent be stopped. Dental Perfection, after becoming a sub-licensee, took precisely the same attitude. In August, 1947, Amalgamated from London wrote to Caulk that it had been informed that one Getz was infringing the patent and named five others that it had reason to believe were infringers and that it, Amalgamated, realized it was under contract to protect the Wilding patent.

The sub-license to Coe issued in 1942, which had been limited in time to six months after cessation of hostilities, had now expired. Caulk was under no obligation to renew this competitive license, but

Coe, having made large expenditures and established a measure of good-will under its license, was offered by Caulk a renewal of the sub-license under the exact royalty terms as had been granted to Dental Perfection. Coe, however, had not accepted the renewal of the sub-license.

The meeting in Washington had been requested by Dental Perfection and Coe and perhaps the reason for the meeting can best be shown from the Directors' meeting of Caulk held the day before the Washington meeting:

"The President announced that the Secretary was to attend a conference in Washington on the next day at which the following persons would be present: Mr. Calvin White, attorney for Dental Perfection Company; Major W. S. Rice, President of Coe Laboratories; the Secretary for the L. D. Caulk Company and Mr. Charles M. Thomas, Caulk counsel.

"The meeting had been requested by Dental Perfection Company and Coe Laboratories, to discuss the following matters:

"1. What action will Caulk take toward requiring Amalgamated to maintain the monopoly under the Wilding patent with decisive court prosecution against the unlicensed competition of alginate impression materials.

"2. What will be the attitude of Caulk toward further licensing of competitive manufacturers of alginate impression material.

"It was unanimously agreed that the Secretary be instructed to make the following statements at the conference:

"1. That Caulk recognizes its responsibility to its two sub-licensees, as well as to itself in the marketing of their respective alginate impression materials, to require Amalgamated to have the Wilding patent adjudicated by a court decision, and to further this end. Caulk will lend its active support to the prosecution as a willing co-plaintiff.

"2. That Caulk does not deem it necessary or advisable at this time to grant any additional licenses under the Wilding patent to supply alginate impression material to the American market."

Under these circumstances the meeting convened in Washington with the named persons in attendance. No stenographic minutes were taken at the meeting, but the parties present subsequently reported the proceedings. The most elaborate report was by Mr. Waples to the Board of Directors of Caulk. It was drawn in considerable detail and to insure its entire accuracy was submitted to Mr. Thomas, who had also been present, and approved by him in every detail. The report showed that the instructions received from the Board of Directors before the meeting had been fully carried out. The report showed that Dental Perfection complained of infringements of the Wilding patent and specifically named eight infringers; that the representative of Coe presented two questions:

"1. What are Caulk and Amalgamated going to do about the competition that is running rampant?

"2. What is Caulk's attitude toward the granting additional licenses under the Wilding patent?"

The report then showed the explicit answers by Mr. Thomas. It was recognized that protection for the two sub-licensees under the Wilding patent must be afforded. It was stated that Caulk was having analyses made of five competing products and that "Caulk intended to select the most appropriate infringer for the institution of legal action by Amalgamated." It was stated that Caulk would join in the prosecution with Amalgamated and that the suit would be prosecuted to final decision with no settlement or compromise. It was also stated that Caulk considered the paramount issue to be the adjudication of the Wilding patent and that "Caulk does not intend to grant any additional sub-li-

censes under the Wilding patent at this time."

The notes of the meeting made by Major Rice of Coe Laboratories, while not as elaborate as those of Mr. Waples, do not greatly differ therefrom. The Rice notes show plainly that Caulk stated it would immediately check on infringers' analyses to determine with surety that the infringement was being done and to actively prosecute a suit against the most likely organization. In submitting these notes to his counsel, Major Rice plainly showed that no infringer had been agreed upon to be prosecuted and that Caulk would determine that at a future time, as he said, "You will note they expect to proceed at once and actively on prosecution of infringement, picking the most likely company, which possibly would be the Getz Company."

The only material variation between the Waples' formal report of the meeting and Rice's notes appears in the omission in the latter of three words with reference to Caulk's policy of issuance of sub-licenses. In the Directors' meeting of the Caulk Company held the day before the Washington meeting the Directors instructed its Secretary to make this statement: "That Caulk does not deem it necessary or advisable at this time to grant any additional licenses under the Wilding patent to supply alginate impression material to the American market." The Waples' report shows Mr. Thomas as viewing the litigation of the patent as the paramount issue and that Caulk did not intend to grant any additional sub-licenses "at this time." These words "at this time" are omitted in the Rice notes, but they do not seem to me of supreme importance. The Government does not contend that a conspiracy and combination was born, nurtured and developed at the meeting of October 29, but merely that the meeting was the "focal point" at which the conspiracy which had been long formulating was finally enacted.

It is of importance, however, that Caulk at the conference reserved to itself the right to grant sub-licenses, and there is no suggestion that this right in any way was shared with Coe or with Dental Perfection. That neither Coe nor its agent, Major Rice, had any idea, either before or after the Washington meeting, that there was any sharing with Caulk as to the grant of sub-licenses or any limitation on Caulk's exclusive right thereto is, to me, quite apparent. Before the Washington meeting and on August 13, 1947 Coe wrote concerning the new contract with Caulk that the renewal royalty agreement is "non-exclusive, non-transferrable and really carries with it no more privilege than has been *and probably will be accorded a number of other manufacturers.*" This does not indicate that Coe knew or thought that no other licenses would be issued to others by Caulk. After the Washington meeting a license from Caulk to Coe was executed. This license had been held in abeyance for some time pending, inter alia, some definite statement as to the protection of the patent against infringers. In the license agreement Coe agreed to pay royalties of 10% and Section 5 provides that if Caulk should thereafter grant a license to any other party at a more favorable royalty rate, Coe would then only be liable for the lower royalty and Caulk expressly agreed to notify Coe of any future license to others at a lower royalty rate. There is here no evidence of any antecedent agreement that no further licenses would be granted by Caulk or of any sharing of the right to grant further licenses. It is a strange provision for Coe to insist upon or accept if it had been agreed that Caulk could grant no further licenses.

That no possible thought existed in Caulk's mind that it had in any manner in 1947 limited or circumscribed its exclusive right to grant sub-licenses or shared this right with others is shown in a letter of May 13, 1949. Reflex Impression Corporation, on April 22, 1949, applied to Caulk for a license under the Wilding patent. Mr. Thomas, counsel for Caulk, on May 13, answered:

"I have duly considered your request for a license under the patent

and have advised my client that it seems inappropriate to grant any further sub-licenses, at least for the time being. As you have probably been advised, suit was instituted by The Amalgamated Dental Company, Ltd. against the William Getz Corporation and Wallace A. Erickson & Company under this patent in the U. S. District Court at Chicago, Illinois. This suit was filed on April 13, 1948, and is now awaiting trial. *It is my view that all consideration regarding the granting of further sub-licenses under the patent should be withheld until the validity and infringement of the patent have been determined by the District Court.* We have every reason to believe that the suit will be tried during the early fall of this year."

That Major Rice's report of the conference was not drawn with the meticulous care that characterized Mr. Waples' report is slightly indicated by the fact that Major Rice listed Mr. Thomas as presently representing Amalgamated, whereas Mr. Thomas was counsel for and representative of Caulk, as was well known to Major Rice.

The only report of the meeting by the representative of Dental Perfection was a short telegram from Mr. White who said, "At meeting today Caull [sic] promised early action with Amalgamated probably against Getz. Assure us no other licenses would be granted or suits settled on any basis involving license grant. * * *" It will be noted that the words "at this time" were also omitted. The omission of these words, however, as contrasted with their inclusion in the careful report of Mr. Waples, seems a frail support to sustain a contention that there had been a sharing by Caulk of the right to grant sub-licenses and charged perhaps with serious consequences, especially when no reasonable motive therefor can be attributed to Caulk.

At the Washington meeting there evidently was some discussion of the Noyes patents held by Dental Perfection, but it seems to have been confined to suggestion of a possible infringer. This matter had been anticipated by Caulk and it was agreed that Caulk "was not interested in adjudicating the D.P. patents— and that our one and only interest is the Wilding patent."

The United States, to maintain its charge of conspiracy against the defendants, contends that the "panorama" of the activities of the defendants shows the conspiracy to exist. It charges a number of component elements which, while perhaps severally unobjectionable, yet make up a conspiratorial picture. Among these may be included:

(a) Pooling of patents;

(b) Control of licenses;

(c) Selection of infringers to be sued;

(d) Exchange of formulae used by infringers.

■■ In determining the legality of the actions of the defendants, both as to any particular activity and the over-all effect of them, the United States contends, and correctly contends, that direct evidence need not be adduced, but that a conspiracy may be shown by "inferences from circumstantial evidence."[3] This I think correct but the word "inference" must be given its true meaning of a logical conclusion from given data or premises and not a conclusion or thought that has no reasonable basis for its existence. As said in Cold Metal Process Co. v. McLouth Steel Corp., 6 Cir., 126 F.2d 185, 188, "An inference is but a reasonable deduction and conclusion from proven facts."

■ Considering, then, the individual actions of the defendants as outlined above and repeating that an illegal conspiracy may exist even though the individual actions may be unobjectionable, we consider:

3. Eastern States Retail Lumber Dealers Ass'n v. United States, 234 U.S. 600, 34 S.Ct. 951, 58 L.Ed. 1490; United States v. Vehicular Parking, Limited, D.C.Del., 54 F.Supp. 828.

(a) *Pooling of patents*. I find no evidence of pooling of patents nor anything from which such pooling might be inferred. Amalgamated owns the Wilding patent and Caulk has an exclusive license with the exclusive right to grant sub-licenses. Caulk has granted a sub-license to Coe and to Dental Perfection. It has declined to grant other sub-licenses. It has expressly refused to allow Dental Perfection or Coe any right to exercise any authority as to whom sub-licenses shall be granted. Coe has never licensed Caulk or Dental Perfection under its Vallandingham patent or given them any rights thereunder. Dental Perfection has never given any rights or licenses to Caulk or Coe or any one else under its four Noyes patents or its Lochridge patent and has expressly announced its intention not to do so.

I find no evidence of pooling of patents or joint control of patents, nor anything from which a reasonable inference to that effect can be drawn.

(b) *Control of licenses*. What has been said to pooling of patents applies largely to control of licenses. No licenses by Coe or Dental Perfection as to the patents owned by them, respectively, is suggested or at issue. As hereinbefore pointed out, Caulk, holding an exclusive license as to the Wilding patent and the exclusive right to grant sub-licenses therefor, has consistently refused to modify this exclusive control. No person other than Caulk claims or is shown to have any right or authority in connection with the grant of any sub-licenses of that patent. The position of Caulk with reference to the grant of sub-licenses is herein shown with reference to the meeting of October 29, 1947.

(c) and (d) *Selection of infringers to be sued* and *Exchange of formulae used by infringers*. These two subdivisions have much in common. They have to do with the protection of the patent rights and the prosecution of infringers and measures to be taken to insure a successful termination of such action. There is in these matters a measure of mutual desire among the defendants. Not only does this seem to me to be unobjectionable, but necessary and proper. Caulk and Coe and Dental Perfection were all paying large royalties to Amalgamated for the use of the patent rights under the Wilding patent for alginate dental impression material. The royalties have amounted to over a million dollars. They had a mutual interest in excluding the use of those patent rights by others without the payment of royalties. Without this exclusion the licenses to use the Wilding patent rights were worse than useless and placed all non-licensed infringers in the class of unfair competitors. In addition to the royalties paid by Coe and Dental Perfection to or for Amalgamated, they also paid large royalties to Caulk as the holder of the exclusive license. It was most natural and, I think, unobjectionable, that Caulk and Coe and Dental Perfection should all want Amalgamated to suppress infringers as it was obligated to do under its license contract. From the time of issuance of the licenses to Coe and Dental Perfection they had been insistent on proceedings against infringers and those companies withheld royalties until this was done. Suit was instituted on April 13, 1948 by Amalgamated and Caulk against Getz and Erickson in the Northern District of Illinois. There is not the slightest indication that this suit was the result of any joint action of the defendants. Coe and Dental Perfection contributed nothing to this suit, either financially or with reference to control of the litigation, and there is nothing to intimate that there was any deviation from the announced intention of Caulk to retain to itself the sole discretion in the selection of any infringer to be proceeded against nor in the established burden of Amalgamated to maintain the action. The suit of Amalgamated and Caulk against Getz and Erickson as reported in 90 U.S.P.Q. 339 resulted in the sustaining the validity of the Wilding patent and the fact of infringement by Getz and Erickson. With this result, of course, Coe and Dental Perfection, as

licensees of the Wilding patent, were well pleased.

Before the Getz suit was brought exhaustive examinations of the Getz product were made to determine the actual fact of infringement of the Wilding patent. Dental Perfection made an analysis and Coe also, to some extent. Caulk had an elaborate series of qualitative and quantitative analyses and Amalgamated had an examination by Wilding himself who, I assume, was the original patentee. Any exchange of analysis of the Getz product, so far as shown, had only to do with the determination of any infringement of the Wilding patent by Getz and Erickson and that was a subject which, properly, had to be investigated to the fullest extent.

■ It is true that some short time after Amalgamated and Caulk sued Getz and Erickson for infringement of the Wilding patent, Noyes or Dental Perfection instituted a similar action against Getz and Erickson for infringement of the Noyes patents. This circumstance is strongly relied upon by the plaintiff as evidencing a joint action of the parties and a pooling of the patents. There is not the slightest evidence, so far as I am aware, that Coe or Caulk were consulted or asked to approve the institution of this suit by Dental Perfection. It seems clear that neither Caulk nor Coe had any license or rights under the Noyes patents or expectation of such and Dental Perfection had expressly stated it intended to grant none. So far as the record discloses it was a matter of supreme indifference to Caulk or to Coe whether in the litigation of Dental Perfection against Getz the Noyes patents were held to be valid or not, or whether or not those patents were infringed by Getz.

I find no evidence of any joint action with reference to the suits against Getz or any matter forming a basis of any reasonable inference of any unlawful combination.

To sustain this present action the Government has cited many authorities. These cannot be considered by me separately and at length. Cases such as the present depend largely on particular facts and the facts of many of the cited cases differ so materially from the facts of the present case as to leave little room for analogy. Finally, many of the cases cited announce principles that are well established and with which this court is in entire accord. Thus the Government cites many authorities to sustain the proposition that the "character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole." [4] There can be no doubt that this is a sound principle supported by all the authorities.

■ So also many authorities are cited to the effect that there need be no formal written agreement or contract to constitute a Sherman Act violation; that it is "enough that a concert of action is contemplated and that the defendants conformed to the arrangement." For this is also cited a number of cases.[5] As to this principle I entertain no measure of dissent.

■ So, too, many authorities are cited to sustain the principle that agree-

4. United States v. Patten, 226 U.S. 525, 544, 33 S.Ct. 141, 145, 57 L.Ed. 333; Swift and Company v. United States, 196 U.S. 375, 396, 25 S.Ct. 276, 49 L.Ed. 518; United States v. Reading Company, 226 U.S. 324, 357, 33 S.Ct. 90, 57 L.Ed. 243; United States v. Pullman Co., D.C., 50 F.Supp. 123, 135, affirmed 330 U.S. 806, 67 S.Ct. 1078, 91 L.Ed. 1263; United States v. New York Great Atlantic & Pacific Tea Co., D.C., 67 F.Supp. 626, 678, affirmed 173 F.2d 79; American Tobacco Co. v. United States, 6 Cir., 147 F.2d 93, affirmed 328 U.S. 781, 66 S.Ct. 1125, 90 L.Ed. 1575; United States v. Vehicular Parking, Limited, D.C., 54 F. Supp. 828, 830; United States v. General Electric Co., D.C., 80 F.Supp. 989, 1004.

5. United States v. Paramount Pictures, 334 U.S. 131, 142, 68 S.Ct. 915, 92 L.Ed. 1260; United States Maltsters Ass'n v. Federal Trade Commission, 7 Cir., 152 F.2d 161; Interstate Circuit v. United States, 306 U.S. 208, 223, 59 S.Ct. 467, 83 L.Ed. 610; American Tobacco Co. v. United States, supra, footnote 4.

ments involving patents may constitute a conspiracy to violate the Sherman Act and the mere existence of a patent monopoly does not exclude the operation of the Sherman Act, 15 U.S.C.A. §§ 1–7, 15 note. To sustain this principle the Government cites the authorities in the footnote.[6] With the foregoing principle I am in entire accord.

The authorities cited by the Government upon another point are not so clear. The Government states that the defendants by 1949 had acquired 85% of the alginate dental impression material in the United States and contends, "The acquisition of such percentage control by combination and conspiracy comprises an unlawful monopolization under Section 2 of the Sherman Act." For this is cited the cases in the footnote.[7] The plaintiff adds that an additional factor for consideration is the strength of the remaining competition. Citing United States v. Columbia Steel Co., 334 U.S. 495, 527, 68 S.Ct. 1107, 92 L.Ed. 1533; United States v. Aluminum Co. of America., D.C., 91 F.Supp. 333, 347.

The relevancy of these citations rests with the words "by combination and conspiracy." With those words present and proven, the citations have relevancy. Without those words or lacking their proof and confronted with a valid patent monopoly, I am of the opinion that the percentage argument has little force or relevancy. I am of the opinion that a holder of a valid patent monopoly and without any unlawful combination or conspiracy with others is not limited to any percentage of control of that article which is covered by the patent. Such I think is the very purpose of the patent laws and of the monopoly created thereby, and this patent feature was not considered in the cases just cited.

Without, of course, indicating any lack of confidence in other cited cases, yet a seeming reliance on United States v. Besser Mfg. Co., D.C., 96 F.Supp. 304, 311, affirmed 343 U.S. 444, 72 S.Ct. 838, 96 L.Ed. 1063, requires some special attention thereto. The facts of the case are too long and too complicated to be given full discussion. Besser, through a period of years by purchase and otherwise, had obtained a commanding position with reference to the manufacture of cement block machines. Among its chief competitors was Stearns who was the sole licensee under patents held by Gelbman and Andrus. In 1942 Besser and Stearns with Gelbman and Andrus entered into a contract whereby Besser and Stearns were given the joint right to use the patents, exclusive with them. The contract further provided that the patentees, Gelbman and Andrus, could not license any one else to use the patent, even with the consent of either Besser or Stearns, but that the consent of both was required. The court said:

"* * * It may well be that an exclusive license to one party would be valid, but here the patentees have joined hands with the two largest competitors in the industry and by terms of their agreement have virtually made it impossible for others to obtain rights under those patents. The contract even gives Stearns and Besser the power to restrict competition—present and future—*by requiring their joint consent before licensing others. It is this combina-*

---

6. Standard Sanitary Manufacturing Co. v. United States, 226 U.S. 20, 49, 33 S.Ct. 9, 57 L.Ed. 107; Blount Mfg. Co. v. Yale & Towne Mfg. Co., 1 Cir., 166 F. 555, 562; United States v. Vehicular Parking, Limited, supra, footnote 4; National Harrow Co. v. Hench, 3 Cir., 83 F. 36, 39 L.R.A. 299; United States v. Line Material Co., 333 U.S. 287, 68 S.Ct. 550, 92 L.Ed. 701; United States v. United States Gypsum Co., 333 U.S. 364, 68 S.Ct. 525, 92 L.Ed. 746; Hartford-Empire Co. v. United States, 323 U.S. 386, 65 S.Ct. 373, 89 L. Ed. 322; United States v. Masonite Corp., 316 U.S. 265, 62 S.Ct. 1070, 86 L. Ed. 1461; United States v. General Electric Co., D.C., 80 F.Supp. 989.

7. United States v. Paramount Pictures, 334 U.S. 131, 167, 172, 68 S.Ct. 915, 92 L.Ed. 1200; American Tobacco Company v. United States, 328 U.S. 781, 795, 797, 66 S.Ct. 1125, 90 L.Ed. 1575; United States v. Aluminum Co. of America, 2 Cir., 148 F.2d 416, 424.

*tion requiring collective action that primarily invalidates the agreement.* [Emphasis added.] We believe it clear that the parties intended this contract to be a means whereby control of the industry could be acquired and competition eliminated."

I can take no exception to the finding of the court in the Besser case. The dissimilarity of the facts of that case, however, makes its application to the present case impossible. In the present case there is no "combination requiring collective action." Caulk had an exclusive license; Caulk, while under no obligation to do so, granted a competitive, non-exclusive license to Coe. Caulk in a settlement of infringement proceedings against Noyes or Dental Perfection granted a non-exclusive competitive license. In the license to Noyes or Dental Perfection and in the similar license subsequently given Coe appears this provision:

"6. Caulk agrees that if it should hereafter grant to any other party a license under the aforesaid Letters Patent No. 2,249,694 at a more favorable royalty than the royalty set forth herein, Noyes may thereafter, at its option, pay such lower royalty in lieu of paying the royalty specified herein. Caulk also agrees that it shall promptly advise Noyes of any license which it may hereafter grant providing for a lower royalty than the royalty specified herein."

Beyond these references there is little mention of the question of sub-licenses by Caulk save at the Washington meeting of Oct. 29, 1947 to which full reference is herein made.

As a somewhat separate and distinct matter the Government alleges that a violation of the Sherman Act occurred by reason of Clause 1, Sec. (c) of the original agreement between Amalgamated and Caulk. The other defendants, Coe and Dental Perfection, are brought into the picture because, as it is alleged, the sub-license agreements between Caulk and Coe and between Caulk and Dental

Perfection were subject to the terms of the original license between Amalgamated and Caulk. The cited section provides:

"Licensor [Amalgamated] further grants to licensee [Caulk] the right to make, use and sell the licensed dental impression material or any improvements thereof in all other countries and islands of the Western Hemisphere not specifically mentioned in Clause (1) Secs. (a) and (b) thereof (excluding, however, New Zealand from this grant) and licensor further agrees that it will not compete either directly or indirectly with the sales of licensee within the territories herein set forth."

The Government's contention under this provision is two-fold:

(a) The Government contends that by this agreement the defendants "have excluded foreign competition from the United States," and that the agreement denied the right of Caulk to export alginate dental impression material "outside the Western Hemisphere."

(b) That a violation of the Sherman Act occurred from the agreement that Amalgamated was prohibited from manufacturing and selling the Wilding impression material in the Western Hemisphere.

■■■ (a) There is to me no discernible suggestion in the contract between Amalgamated and Caulk which in any way concerns rights outside of the Western Hemisphere. Caulk, by Section 1(a) of the contract, obtained exclusive rights in the United States; by Section 1(b) it obtained the same exclusive rights in Canada, Argentina, Chile and Uruguay; by Section 1(c) Caulk is given the right to make, use and sell the licensed dental impression material in all other countries or islands of the Western Hemisphere (excluding New Zealand). Amalgamated, by Section 1(c), agrees it will not compete directly or indirectly with the sales of the licensee in the territories mentioned. My attention is not drawn to the distinction, if there be any, between an "exclusive" license on the one

hand and on the other a license to "make, use and sell" in a given territory accompanied with an agreement that the licensor will not compete in that territory, directly or indirectly. This matter, however, has little importance as to the present discussion. As to the world outside of the Western Hemisphere Caulk had no given or implied rights and no express prohibitions. As to those localities beyond the Western Hemisphere, Caulk, having no rights, would be as any stranger and in case of using a patented article without a license, would be as any other infringer. Caulk, having no rights beyond the Western Hemisphere, could and did give no rights in its sub-licenses to Coe and Dental Perfection. These sub-licenses did not purport to grant any rights beyond the Western Hemisphere.

Indeed, unless I be mistaken, the very amendment of the original Amalgamated-Caulk agreement, which amendment is dated May 20, 1947, only gives Caulk "the exclusive right to grant sub-licenses of licensee's own choosing *throughout the United States of America.*"

In 1948 when there arose some question of Coe's shipments beyond the Western Hemisphere, Caulk expressly and completely denied the existence of any agreement, written or oral, or any understanding with any sub-licensee other than as expressly set out in the formal sub-license.

In 1947 Amalgamated complained to Caulk that Dental Perfection was selling under the Wilding patent in Switzerland in violation of Amalgamated's Swiss patent. Caulk immediately announced it had no rights under the Swiss patent and referred Amalgamated to deal directly with Dental Perfection. The Government purports to see something sinister in the shipments by Dental Perfection outside the Western Hemisphere. So it states that during the five years from 1942–1947 Dental Perfection sold $13,-311.10 of alginate dental impression material outside the Western Hemisphere. These sales being before its

license of course were not made pursuant to any license under the Wilding patent. The Government then states that for the three years (1948–1950) after the sub-license from Caulk, Dental Perfection sold outside the Western Hemisphere and under the Wilding patent $7,550.59 and sold during the period and outside the Western Hemisphere under its own Noyes-Lochridge patents impression material amounting to $112,122.16. It needs no more than a suggestion that sales under the Wilding patent by Dental Perfection were subject to 10% royalties and sales under its Noyes-Lochridge patents were subject to no royalties.

I am of the opinion that the agreement between Amalgamated and Caulk had no relation whatever to any shipments outside the Western Hemisphere and no facts have been shown from which such inference might be drawn.

██ (b) The Government contends that a violation of the Sherman Act occurred from the agreement that Amalgamated would not compete with Caulk in the Western Hemisphere outside of the United States. It is difficult to follow the reasoning in this particular. Amalgamated had given Caulk an exclusive license for the use of the Wilding patent in the United States. The inclusion of Clause 1(c) was without effect as to any use of the Wilding patent by Amalgamated in the United States, the field of operation of the Sherman Act. Neither with nor without the paragraph could Amalgamated have introduced material involving the use of the Wilding patent in the United States. This is an action based on combination and conspiracy of the three named defendants. No shown connection exists between the defendants Coe and Dental Perfection as to Clause 1(c). This is not an action against Amalgamated and Caulk based on any improper use of the patent and I can see no violation of the Sherman Act by the clause in question.

The Clause (1(c)) was largely inoperative and since this suit has started the Clause has been entirely abrogated and

repealed.[8] The Government correctly claims that this post-complaint change of status has no effect on the case as established at the time the complaint was filed.[9] In this case, however, the only relief sought is injunctive relief operating in the future. Insofar as the future is concerned, the operation of Clause 1(c) might be considered as largely moot. If, except for this provision, there is established any unlawful combination or conspiracy between the parties, then the consideration of the post-complaint abrogation of Clause 1(c) would be postponed until the time for final consideration of the decree. Since, however, in this opinion there is not found any unlawful combination or conspiracy between the defendants, then the consideration of the mootness of Clause 1(c) will not be further continued.

I have not found in the actions of the defendants any violation of the Sherman Act or any intent to commit such violation. Of course, if the violation had been found the intent would have been established as the defendants would be presumed to have intended the consequences of their acts.[10] The conclusion reached by me is based not only upon the individual actions of the several defendants but also upon a consideration of the sum total of those actions or the general pattern created thereby. I do not find in any actions of the defendants herein complained of any attempt to monopolize the use of any alginate dental material which is unconnected with the teachings and use of the Wilding patent, but only a desire to protect those rights which have been given under that patent to the respective parties by the patent laws of the United States or the licenses issued pursuant thereto.

That a valid patent gives to its owner certain rights which may be considered as "monopolistic" is beyond question. So in United States v. Line Material Co., 333 U.S. 287, 308, 68 S.Ct. 550, 561, 92 L.Ed. 701, it is said:

"During its term, a valid patent excludes all except its owner from the use of the protected process or product. * * * This monopoly may be enjoyed exclusively by the patentee or he may assign the patent or 'any interest therein' to others. * * * The Sherman Act was enacted to prevent restraints of commerce but has been interpreted as recognizing that patent grants were an exception. * * * The monopoly granted by the patent laws is a statutory exception to this freedom for competition and consistently has been construed as limited to the patent grant."

As hereinbefore indicated holders of patents may by confederation or conspiracy be subject to the Sherman Act but, as stated in the case just cited, "It is not the monopoly of the patent that is invalid. It is the use of that monopoly, improperly."

In this case there have been some references to the failure or refusal to grant sub-licenses under the Wilding patent. The purpose of the references has not been entirely clear. If, as I believe, the patent laws give to the holder of a valid patent the exclusive rights covered thereby and the further right to grant or not to grant licenses for the use thereof by others, then I know of no violation of any law caused by the holder's refusal to grant licenses or rights under the patent. This is, of course, based upon the assumption that the option to grant licenses or rights is exercised by the holder of the patent or rights and by him alone. He may not, by confederation, combination or conspiracy, unite with others in restraint of trade in connection with his patent.

Because I have found no unlawful confederation or conspiracy on the part

8. United States v. L. D. Caulk Co., D.C., 114 F.Supp. 939.

9. United States v. W. T. Grant Co., 345 U.S. 629, 73 S.Ct. 894, 97 L.Ed. 1303.

10. United States v. Patten, 226 U.S. 525, 543, 33 S.Ct. 141, 57 L.Ed. 333; United States v. Masonite Corp., 316 U.S. 265, 275, 62 S.Ct. 1070, 86 L.Ed. 1461.

of the defendants to violate the Sherman Act, so I must grant the motions for summary judgment in favor of the several defendants.

Appropriate orders may be submitted.